*RECOMMENDED FOR FULL-TEXT PUBLICATION*
Pursuant to Sixth Circuit Rule 206

ELECTRONIC CITATION: 2003 FED App. 0447P (6th Cir.)
File Name: 03a0447p.06

# UNITED STATES COURT OF APPEALS

## FOR THE SIXTH CIRCUIT

———————————

AMERICAN CIVIL LIBERTIES
UNION OF KENTUCKY, et al.,
    *Plaintiffs-Appellees,*

    *v.*

MCCREARY COUNTY,
KENTUCKY, et al.,
    *Defendants-Appellants.*

No. 01-5935

Appeal from the United States District Court
for the Eastern District of Kentucky at London.
Nos. 99-00507; 99-00508; 99-00509—
Jennifer B. Coffman, District Judge.

Argued: December 4, 2002

Decided and Filed: December 18, 2003

Before: RYAN, CLAY, and GIBBONS, Circuit Judges.

———————————

## COUNSEL

**ARGUED:** Mathew D. Staver, LIBERTY COUNSEL,
Longwood, Florida, for Appellants. David A. Friedman,
AMERICAN CIVIL LIBERTIES UNION OF KENTUCKY,

Louisville, Kentucky, for Appellees. **ON BRIEF:** Mathew
D. Staver, Erik W. Stanley, LIBERTY COUNSEL,
Longwood, Florida, Johnnie L. Turner, LAW OFFICES OF
JOHNNIE L. TURNER, Harlan, Kentucky, for Appellants.
David A. Friedman, AMERICAN CIVIL LIBERTIES
UNION OF KENTUCKY, Louisville, Kentucky, for
Appellees. David R. Huggins, NATIONAL LEGAL
FOUNDATION, Virginia Beach, Virginia, for Amicus
Curiae.

CLAY, J., delivered the opinion of the court. GIBBONS,
J. (pp. 43-44), delivered a separate concurring opinion.
RYAN, J. (pp. 45-80), delivered a separate dissenting
opinion.

———————————

## OPINION

———————————

CLAY, Circuit Judge. Defendants, two Kentucky counties
and a county school district, as well as three officials of these
governmental entities, appeal from the district court's order
granting Plaintiffs' motion for a supplemental preliminary
injunction prohibiting Defendants from displaying copies of
the Ten Commandments in three separate displays on the
basis that Plaintiffs showed a strong likelihood of succeeding
on their claim that Defendants' displays violated the
Establishment Clause of the First Amendment. For the
reasons set forth below, we **AFFIRM**.

## I.
## BACKGROUND

### A. Procedural History

On November 18, 1999, seven individuals in three
Kentucky counties (McCreary County, Harlan County, and
Pulaski County) along with the American Civil Liberties

Union ("ACLU") filed three lawsuits in the United States District Court for the Eastern District of Kentucky, alleging that these counties had erected displays consisting of framed copies of the Ten Commandments in the county courthouses of McCreary and Pulaski Counties, as well as in the schools of the Harlan County School District, in violation of the Establishment Clause of the First Amendment.[1] Plaintiffs sought a declaration that the displays were unconstitutional, as well as preliminary and permanent injunctive relief enjoining the counties from continuing their display of the Ten Commandments.

Shortly after the complaint was filed, Defendants modified the displays to include secular historical and legal documents, some of which were excerpted, and then filed respective motions to dismiss. Following a hearing held on April 20, 2000, the district court issued an order on May 5, 2000 in each of the three cases which denied Defendants' motions to dismiss and granted Plaintiffs' motions for preliminary

---

[1] The three lawsuits were considered as one by the district court, and are so considered on appeal. *See ACLU of Ky. v. McCreary County, Ky.*, 96 F. Supp. 2d 679, 682 n.2 (E.D. Ky. 2000) ("This is one of three companion cases, simultaneously filed, which attack such displays. Any minimal variances among the three displays possess no legal significance for the purpose of the motions now pending before the court. Having observed that the case records also share similar complaints, memoranda, and motions and that the three cases share identical lead counsel on both sides, the court combined the three for oral argument and today enters virtually identical opinions— with necessary but slight factual variations—in all three."). The three opinions of which the district court spoke are as follows: *ACLU of Ky. v. McCreary County, Ky.*, 96 F. Supp. 2d 679 (E.D. Ky. 2000) ("*McCreary I*"); *ACLU of Ky v. Pulaski County, Ky.*, 96 F. Supp. 2d 691 (E.D. Ky. 2000); *Doe v. Harlan County Sch. Dist.*, 96 F. Supp. 2d 667 (E.D. Ky. 2000). The district court eventually consolidated the three cases under case number 99-507. All Defendants filed a single notice of appeal from the district court's June 22, 2001, order granting Plaintiffs' motion for a supplemental preliminary injunction. *ACLU of Ky. v. McCreary County, Ky.*, 145 F. Supp. 2d 845 (E.D. Ky. 2001) ("*McCreary II*") (order granting Plaintiffs' motion for supplemental preliminary injunction).

injunctive relief; the court ordered that the displays be removed and that no similar displays be erected. Defendants filed a notice of appeal to this Court, and a motion to stay the injunction pending appeal. The district court denied the motion to stay, as did this Court.

Defendants allegedly obtained new counsel and then filed a motion to clarify the district court's preliminary injunction as to all Defendants regarding the court's prohibition against erecting "similar displays." The district court denied the motion for clarification on September 15, 2000, stating that "the injunction speaks for itself." (J.A. at 119.)

Defendants, allegedly acting on the belief that a display containing the Ten Commandments could be erected within the parameters of the Constitution, voluntarily dismissed their appeal to this Court and erected new displays containing several additional secular historical and legal documents in their entirety, along with the Ten Commandments. The courthouse displays contained an explanation entitled the "Foundations of American Law and Government Display" which explained that the displays included various documents that played a significant role in the founding of the American system of law and government. The school district displays contained similar documents to the courthouse displays, except instead of the "Foundations of American Law and Government Display" explanation, the School Board displays contained a School Board Resolution. The Resolution addressed the historical context of the displays and opened a forum for the community to post an unlimited number of additional historical documents.

As a result of these new displays, Plaintiffs filed a motion to hold Defendants in contempt for violating the district court's preliminary injunction or, in the alternative, to enter a supplemental preliminary injunction order. Defendants responded to Plaintiffs' motion by arguing that the new displays were not similar to the previous displays, and contended that the "purpose for the display is to educate

citizens of the county regarding some of the documents that played a significant role in the foundation of our system of law and government." (J.A. at 151.)

A hearing was held on March 30, 2001, at which time the district court denied Plaintiffs' motion for contempt, and on April 2, 2001, the court entered a corresponding order denying the motion for contempt, while urging the parties to settle the matter. The court noted in the order, however, that if the parties could not reach a settlement by April 30, 2001, the court would rule upon Plaintiffs' motion for a supplemental preliminary injunction. The parties failed to reach a settlement, and the district court then issued an order granting Plaintiffs' motion for a supplemental preliminary injunction on June 22, 2001. It is from the district court's order granting Plaintiffs' motion for a supplemental preliminary injunction that Defendants now appeal.

## B.   Facts

In 1999, McCreary County erected a display of the Ten Commandments in the McCreary County Courthouse consisting of "at least one framed copy of one version of the Ten Commandments and [which] was not part of any larger educational, historical, or retrospective exhibit." *McCreary I, supra* note 1, at 684. The display was erected pursuant to an order signed by Defendant Jimmie Greene, McCreary County Judge Executive. *Id.* Likewise, Pulaski County officials erected a copy of the Ten Commandments in the Pulaski County courthouse in the same fashion. *Pulaski, supra* note 1, at 695. The Pulaski display was erected by Defendant Darrell Beshears, Pulaski County Judge Executive. *Id.* The courthouse displays, both in their initial and later in their modified forms, were "readily visible to the plaintiffs and the other county citizens who use the courthouse to conduct civic business, to obtain or renew driver's licenses and permits, to register cars, to pay local taxes, and to register to vote." *McCreary I, supra* note 1, at 684; *Pulaski, supra* note 1, at 695. The schools in Harlan County School District

displayed copies of a version of the Ten Commandments in their classrooms which, like the courthouse displays, initially consisted of "framed copies of one version of the Ten Commandments which were not part of larger educational, historical or retrospective exhibits." *Harlan, supra* note 1, at 671.

After Plaintiffs filed suit, Defendants amended the respective displays "in an attempt to bring the display[s] within the parameters of the First Amendment and to insulate themselves from suit." *McCreary I, supra* note 1, at 684. Specifically, the Courthouse displays were modified to consist of:

(1) an excerpt from the Declaration of Independence; (2) the Preamble to the Constitution of Kentucky; (3) the national motto of "In God We Trust"; (4) a page from the Congressional Record of Wednesday, February 2, 1983, Vol. 129, No. 8, declaring it the Year of the Bible and including a copy of the Ten Commandments; (5) a proclamation by President Abraham Lincoln designating April 30, 1863 a National Day of Prayer and Humiliation; (6) an excerpt from President Lincoln's "Reply to Loyal Colored People of Baltimore upon Presentation of a Bible" reading, "The Bible is the best gift God has ever given to man."; (7) a proclamation by President Ronald Reagan marking 1983 the Year of the Bible; and (8) the Mayflower Compact.

*Id.* (footnote omitted); *see also Pulaski, supra* note 1, at 695-96. The School Board display was modified to include those documents included in the modified courthouse displays, along with the addition of "a recently enacted Kentucky statute, K.R.S. 158.195, which the defendants allege permits the posting of the Ten Commandments; and …a Harlan County School Board resolution permitting the posting of the Ten Commandments." *Harlan, supra* note 1, at 672. Also common to all three modified displays was the fact that while some of the added documents were "displayed in their

entirety, the defendants [] excerpted a small portion of others to include only that document's reference to God or the Bible with little or no surrounding text." *McCreary I*, *supra* note 1, at 684; *Pulaski*, *supra* note 1, at 696; *Harlan*, *supra* note 1, at 672.

Despite the modifications, Plaintiffs sought a preliminary injunction from the district court to enjoin Defendants from displaying the modified exhibits, and the district court granted the preliminary injunction as to all three displays. *See McCreary I*, *supra* note 1, at 691. The district court found that "the amended displays failed the 'purpose' and 'effect' prongs of the three-part test set out in *Lemon v. Kurtzman*, 403 U.S. 602 (1971), in that they lacked a secular purpose and had the effect of endorsing religion." *McCreary II*, *supra* note 1, at 846 (footnotes omitted). The court ordered that the displays be removed "immediately" and further ordered that "similar displays" could not be erected in the future. *McCreary I*, *supra* note 1, at 691.

Defendants then posted a third version of the displays, presuming that the modified displays were in conformity with the law as set forth in the district court's opinions. The new courthouse displays consisted of the entire Star Spangled Banner, the Declaration of Independence, the Mayflower Compact, the Bill of Rights, the Magna Carta, the National Motto, the Preamble to the Kentucky Constitution, the Ten Commandments[2], Lady Justice and a one-page prefatory

---

[2]This version of the Ten Commandments reads as follows:

Thou shalt have no other gods before me.

Thou shalt not make unto thee any graven image, or any likeness of any thing that is in heaven above, or that is in the earth beneath, or that is in the water underneath the earth: Thou shalt not bow down thyself to them, nor serve them: for I the LORD thy God am a jealous God, visiting the iniquity of the fathers upon the children unto the third and fourth generation of them that hate me.

document entitled "The Foundations of American Law and Government Display." (J.A. 161-74.) The prefatory description states that the "display contains documents that played a significant role in the foundation of our system of law and government." (J.A. at 161.) With regard to the Ten Commandments, the prefatory description states:

The Ten Commandments have profoundly influenced the formation of Western legal thought and the formation of our country. That influence is clearly seen in the Declaration of Independence, which declared that, "We hold these truths to be self-evident, that all men are created equal, that they are endowed by their Creator with certain unalienable Rights, that among these are Life, Liberty, and the pursuit of Happiness." The Ten Commandments provide the moral background of the

---

Thou shalt not take the name of the LORD thy God in vain: for the LORD will not hold him guiltless that taketh his name in vain.

Remember the sabbath day, to keep it holy.

Honour thy father and mother: that thy days may be long upon the land which the LORD thy God giveth thee.

Thou shalt not kill.

Thou shalt not commit adultery.

Thou shalt not steal.

Thou shalt not bear false witness against thy neigbour.

Thou shalt not covet thy neighbour's house, thou shalt not covet thy neighbour's wife, nor his manservant, nor his maidservant, nor his ox, nor his ass, nor any thing that is thy neighbour's.

Exodus 20: 3-17
King James Version

(J.A. 169.)

Declaration of Independence and the foundation of our legal tradition.

*Id.* There is no other discussion of the Ten Commandments and how it purportedly relates to any of the other documents in the display.

The new School Board displays consisted of the entire Star Spangled Banner, the Declaration of Independence, the Mayflower Compact, the Bill of Rights, the Magna Carta, the National Motto, the Preamble to the Kentucky Constitution, an excerpt of the Congressional Record containing the Ten Commandments,[3] Kentucky Statute § 158.195 regarding the

---

[3]The Ten Commandments are included in a statement of Representative Philip M. Crane of Illinois in which he discusses a Joint Resolution authorizing then-President Reagan to declare 1983 to be the "Year of the Bible." *See* (J.A. 208.) (statement of Rep. Crane; quoting H.J. Res. 487, 98th Cong. (1983)). Representative Crane's version of the Ten Commandments reads:

1. I am the Lord thy God, thou shalt have no other gods before me.

2. Thou shalt not make unto thee any graven image.

3. Thou shalt not take the name of the Lord thy God in vain.

4. Remember the Sabbath day to keep it holy.

5. Honor thy father and mother.

6. Thou shalt not kill.

7. Thou shalt not commit adultery.

8. Thou shalt not steal.

9. Thou shalt not bear false witness.

10. Thou shalt not covet.

*Id.*

posting of historical displays and a School Board Resolution ("the Resolution"). (J.A. at 198-208.) The Resolution stated, in part:

> We believe these … documents positively contribute to the educational foundations and moral character of students in our schools. … [I]t is our opinion that these … documents, taken as a whole, are valuable examples of documents that may instill qualities desirable of the students in our schools, and have had particular historical significance in the development of this country.

(J.A. at 198.) The Resolution also contained a procedure that would permit any person to request the posting of other historical documents with the permission of the Harlan County Board of Education. (J.A. at 198-99.)

The district court, after recognizing the Supreme Court's approval of "two constitutionally permissible uses of the Ten Commandments within the public arena," found that the new displays were "clearly outside the bounds of these permissible uses and [were] violative of the Establishment Clause." *McCreary II*, *supra* note 1, at 852-53 (citing *County of Allegheny v. ACLU*, 492 U.S. 573 (1989) and *Stone v. Graham*, 449 U.S. 39 (1980)). The district court thus enjoined Defendants from continuing with the new displays and ordered all three to be removed immediately from their respective locations. *McCreary II*, *supra* note 1, at 853.

## II.
## DISCUSSION

### A.  Standard of Review

A preliminary injunction is an extraordinary measure that has been characterized as "one of the most drastic tools in the arsenal of judicial remedies." *Hanson Trust PLC v. ML SCM Acquisition Inc.*, 781 F.2d 264, 273 (2d Cir. 1986) (citation omitted); *see also Detroit Newspaper Publishers. Ass'n v.*

*Detroit Typographical Union No. 18,* 471 F.2d 872, 876 (6th Cir. 1972) (emphasizing that a preliminary injunction is the strong arm of equity which should not be extended to cases which are doubtful or do not come within well-established principles of law). This Court reviews the district court's decision to grant a preliminary injunction for an abuse of discretion while giving great deference to the district court's determination; however, this Court's deference to the district court is not absolute. *Mascio v. Pub. Employees Ret. Sys.,* 160 F.3d 310, 312-13 (6th Cir. 1998). The injunction will be disturbed if the district court relied upon clearly erroneous findings of fact, improperly applied the governing law, or used an erroneous legal standard. *See Blue Cross & Blue Shield Mut. v. Blue Cross & Blue Shield Ass'n,* 110 F.3d 318, 322 (6th Cir. 1997). "A finding is 'clearly erroneous' when although there is evidence to support it, the reviewing court is left with the definite and firm conviction that a mistake has been committed." *See United States v. United States Gypsum, Co.,* 333 U.S. 364, 395 (1948).

**B.   Analysis**

In the exercise of its discretion with respect to a motion for preliminary injunction,

a district court must give consideration to four factors: "(1) whether the movant has a strong likelihood of success on the merits; (2) whether the movant would suffer irreparable injury without the injunction; (3) whether issuance of the injunction would cause substantial harm to others; and (4) whether the public interest would be served by issuance of the injunction." *Rock & Roll Hall of Fame & Museum, Inc. v. Gentile Prods.,* 134 F.3d 749, 753 (6th Cir. 1998).

*Mascio*, 160 F.3d at 312-13. Federal Rule of Civil Procedure 52(c) "requires a district court to make specific findings concerning each of these four factors, unless fewer are

dispositive of the issue." *See In re DeLorean Co.,* 755 F.2d 1223, 1228 (6th Cir. 1985).

In *Elrod v. Burns*, 427 U.S. 347, 373 (1976), the Supreme Court held that when reviewing a motion for a preliminary injunction, if it is found that a constitutional right is being threatened or impaired, a finding of irreparable injury is mandated. In other words, the first factor of the four-factor preliminary injunction inquiry—whether the plaintiff shows a substantial likelihood of succeeding on the merits—should be addressed first insofar as a successful showing on the first factor mandates a successful showing on the second factor—whether the plaintiff will suffer irreparable harm. *See id.; see also Connection Distrib. Co. v. Reno,* 154 F.3d 281, 288 (6th Cir. 1998) (finding that "[w]hen a party seeks a preliminary injunction on the basis of the potential violation of the First Amendment, the likelihood of success on the merits often will be the determinative factor").

**1.   Strong Likelihood of Success on the Merits**

The Establishment Clause of the First Amendment provides that "Congress shall make no law respecting an establishment of religion." U.S. Const., amend. I. This clause is made applicable to the states through the Fourteenth Amendment. *See Everson v. Bd. of Educ.*, 330 U.S. 1, 8 (1947). As the Supreme Court has recognized, "[t]he Establishment Clause, at the very least, prohibits government from appearing to take a position on questions of religious beliefs or from 'making adherence to a religion relevant in any way to a person's standing in the political community.'" *County of Allegheny v. Am. Civil Liberties Union*, 492 U.S. 573, 593-94 (1989) (quoting *Lynch v. Donnelly*, 465 U.S. 668 (1984)).

While sitting *en banc*, this Court recently observed that although individual Supreme Court justices have expressed reservations regarding the test set forth in *Lemon v. Kurtzman*, 403 U.S. 602 (1971) for determining whether a particular government action violates the Establishment

Clause, *see Am. Civil Liberties Union of Ohio v. Capital Square Review & Advisory Bd.*, 243 F.3d 289, 306 & n.15 (6th Cir. 2001) (*en banc*) (collecting cases), this Court, as an intermediate federal court, is bound to follow the *Lemon* test until the Supreme Court explicitly overrules or abandons it. *Adland v. Russ*, 307 F.3d 471, 479 (6th Cir. 2002) (citing *Grutter v. Bollinger*, 288 F.3d 732, 743 (6th Cir. 2002)).

The *Lemon* test, as originally formulated, required reviewing courts to consider whether (1) the government activity in question has a secular purpose; (2) whether the activity's primary effect advances or inhibits religion; and (3) whether the government activity fosters an excessive entanglement with religion. *Lemon*, 403 U.S. at 612-13. Although this remains the original formulation of the *Lemon* test, this Court has recognized in recent years that the Supreme Court has applied what is known as the "endorsement" test, which looks to whether a reasonable observer would believe that a particular action constitutes an endorsement of religion by the government. *See Adland*, 307 F.3d at 479 (citing *Granzeier v. Middleton*, 173 F.3d 568, 573 (6th Cir. 1999) (collecting cases) and *Hawley v. City of Cleveland*, 24 F.3d 814, 822 (6th Cir. 1994)). Accordingly, this Court has held that the endorsement test "should be treated 'as a refinement of the second *Lemon* prong.'" *Baker v. Adams County/Ohio Valley Sch. Bd.*, 310 F.3d 927, 929 (6th Cir. 2002) (quoting *Adland*, 307 F.3d at 479). If a plaintiff establishes a violation of any prong of the *Lemon* test, then the government action is unconstitutional. *See, e.g., Edwards v. Aguillard*, 482 U.S. 578, 583 (1987).

### a.   "Purpose" Prong of the *Lemon* Test

Although a government's stated purposes for a challenged action are to be given some deference, it remains the task of the reviewing court to "distinguis[h] a sham secular purpose from a sincere one." *Santa Fe Indep. Sch. Dist. v. Doe*, 530 U.S. 290, 308 (2000). Specifically, it is up to this Court to determine whether Defendants' inclusion of the Ten

Commandments in the displays was a "purposeful or surreptitious effort to express some kind of subtle governmental advocacy of a particular religious message." *Lynch*, 465 U.S. at 680. To satisfy this prong of the *Lemon* test, Plaintiffs must show that Defendants' predominate purpose for the displays was religious. *See Adland*, 307 F.3d at 480 ("Although a totally secular purpose is not required, it is clear that the secular purpose requirement is not satisfied . . . by the mere existence of some secular purpose, however dominated by religious purposes.") (internal quotation marks and citations omitted). *See also Stone,* 449 U.S. at 41 (examining "pre-eminent purpose for posting the Ten Commandments on schoolroom walls"); *Aguillard,* 482 U.S. at 599 (Powell , J., concurring) ("A religious purpose alone is not enough to invalidate an act of a state legislature. The religious purpose must predominate.") (citations omitted).

As noted by the district court below, Defendants herein articulated the following purposes for the latest versions of the displays:

(1) to erect a display containing the Ten Commandments that is constitutional;
(2) to demonstrate that the Ten Commandments were part of the foundation of American Law and Government;
(3) [to include the Ten Commandments] as part of the display for their significance in providing "the moral background of the Declaration of Independence and the foundation of our legal tradition;"
(4) to educate the citizens of the county regarding some of the documents that played a significant role in the foundation of our system of law and government; and
(5) [as stated by the Harlan County School Board] to create a limited public forum on designated walls within the school district for the purpose of posting historical documents which played a significant role in the development, origins or foundations of American or Kentucky law. . . .

*McCreary II*, *supra* note 1, at 848 (citations to record and footnotes omitted). The district court found that the first three purposes were, "on their face, religious in nature and therefore impermissible," and that "the history of the display belies the secular intentions of the other two." *Id.* at 848-49. We agree with the district court's ultimate conclusion that the predominate purpose of the displays was religious. We do take issue, however, with some of the district court's reasoning underpinning that conclusion.

The district court reasoned that the first three articulated purposes were "facially" unconstitutional under the Supreme Court's holding in *Stone v. Graham*, inasmuch as "that case established that a state's desire to proclaim the Ten Commandments' foundational value for American law and government is a religious, rather than secular, purpose." *McCreary II*, *supra* note 1, at 849. The court went on to note that in *Stone*, the Commonwealth of Kentucky sought to post the Ten Commandments along with the following notation: "'The secular application of the Ten Commandments is clearly seen in its adoption as the fundamental legal code of Western Civilization and the Common Law of the United States.'" *Id.* (quoting *Stone*, 449 U.S. at 41). The court opined that this "putatively secular purpose" in *Stone* was rejected by the Supreme Court, and "is fundamentally the same as the defendants' first three articulated purposes" in the matter at hand. *Id.*

This Court disagrees. On its face, the first articulated purpose – to erect a constitutional display of the Ten Commandments – has nothing to do with the state's desire to proclaim the Ten Commandments' foundational contribution to American law and government. Rather, the facial purpose is simply to comport governmental conduct (i.e., the displays) with the law. Nevertheless, the first statement of purpose does not satisfy Defendants' burden of articulating a secular purpose for the displays, because this statement merely begs the ultimate legal question of whether Defendants' conduct is constitutional. This avowed purpose fails to shed any light on

Defendants' motivation for creating the displays; at most, this purpose explains certain alterations Defendants made to the displays, but not the *raison d'etre* of the displays.[4] Accordingly, the first stated purpose does not constitute a secular purpose as a matter of law. *See Adland,* 307 F.3d at 482 (finding that government had failed to articulate a secular explanation for Ten Commandments display where "its asserted secular justification is intended merely to avoid Establishment Clause liability rather than to actually further a legitimate secular purpose"); *Books v. City of Elkhart, Ind.*, 235 F.3d 292, 304 (7th Cir. 2000) ("… [W]e shall not accept a stated purpose that merely seeks to avoid a potential Establishment Clause violation.")

This Court also disagrees with the district court's pronouncement about the second and third stated purposes, based on the Supreme Court's decision in *Stone*, that "a state's desire to proclaim the Ten Commandments' foundational value for American law and government is a religious, rather than secular, purpose." *McCreary II*, *supra* note 1, at 849. In *Stone*, a state statute required the posting of the Ten Commandments on the wall of each public school classroom. Underneath the last Commandment appeared the following disclaimer: "The secular application of the Ten Commandments is clearly seen in its adoption of the fundamental legal code of Western Civilization and the Common Law of the United States." *Id.* at 40 n.1. The Court held that the "pre-eminent purpose for posting the Ten Commandments on schoolroom walls is plainly religious in nature" because the Commandments "are undeniably a sacred text in the Jewish and Christian faiths." *Id.* at 41. The Court rejected the "supposed" secular purpose of teaching the foundational role the Ten Commandments played in our

_____

[4] The first stated purpose might not be question-begging if Defendants had created the displays in the context of a legal discussion in order to illustrate the constitutional limits of religious expression by governmental entities. This is clearly not the case.

civilization and legal system because merely posting the Ten Commandments fulfilled no "educational function." *Id.* at 42. The Court further opined that the outcome of the case may have been different had the Ten Commandments been "integrated into the school curriculum … in an appropriate study of history, civilization, ethics, comparative religion, or the like." *Id.* (citation omitted).

*Stone* established no *per se* rule that displaying the Ten Commandments in an educational setting is unconstitutional. *See also Aguillard,* 482 U.S. at 607-08 (Powell, J., concurring) ("[I]t is worth noting that the Establishment Clause does not prohibit *per se* the educational use of religious documents in public school education."); *Lynch,* 465 U.S. at 678-79 ("… [A]n absolutist approach in applying the Establishment Clause is simplistic and has been uniformly rejected by the Court. … In each case, the inquiry calls for line drawing; no fixed, *per se* rule can be framed."). Moreover, contrary to the district court's conclusion, *Stone* announced no *per se* prohibition against displaying the Ten Commandments for the purpose of demonstrating a connection with the structure of American law or government. In fact, several courts have indicated that a display for such a purpose may be permissible. *See Aguillard,* 482 U.S. at 593-94 ("[T]he Court acknowledged in *Stone* that its decision forbidding the posting of the Ten Commandments did not mean that no use could ever be made of the Ten Commandments, or that the Ten Commandments played an exclusively religious role in the history of Western Civilization.") (citing *Stone,* 449 U.S. at 42); *Books,* 235 F.3d at 302 ("The text of the Ten Commandments no doubt has played a role in the secular development of our society and can no doubt be presented by the government as playing such a role in our civic order.") Similarly, it is conceivable that the Ten Commandments could be incorporated into a comparative religion course or a study of "the nature of the Founding Father's religious beliefs and how these beliefs affected the attitudes of the times and the structure of our

government." *Aguillard,* 482 U.S. at 606-07 (Powell, J., concurring) (discussing the Bible generally).

To comply with *Stone,* however, a purported historical display must present the Ten Commandments objectively and integrate them with a secular message. When such a display consists almost entirely of reading material posted in a public school, the most logical way of achieving this goal is by integrating the Ten Commandments with a secular curriculum, such as through the objective study of history, ethics or comparative religion. *See Stone,* 449 U.S. at 42; *Abington Sch. Dist. v. Schempp,* 374 U.S. 203, 225 (1963) ("… [S]tudy of the Bible or of religion, when presented objectively as part of a secular program of education, may … be effected consistently with the First Amendment."). Several factors are relevant when assessing whether the Ten Commandments have been presented objectively and integrated with a secular message: the content of the displays, the physical setting in which the Ten Commandments are displayed and any changes that Defendants have made to the displays since their inception. *See Santa Fe Indep. Sch. Dist.,* 530 U.S. at 315 (holding that school's original policy on student-led prayer, which "unquestionably violated the Establishment Clause," was relevant to determining constitutionality of modified policy because the Court's inquiry "not only can, but must, include an examination of the circumstances surrounding its enactment"); *Adland,* 307 F.3d at 481 (in assessing state's avowed secular purpose in displaying Ten Commandments monument, Court looked to linguistic content of the statute authorizing the display and the intended physical context of the display).

The animating principle of *Stone* applies equally in a courthouse setting: the government must present the Ten Commandments objectively and must integrate them with a secular message. The government achieves this goal by ensuring that the symbols, pictures and/or words in the display share a common secular theme or subject matter. *See Adland,* 307 F.3d at 481 (applying *Stone* to display of Ten

Commandments on State's capitol grounds; expressing approval of the frieze on the wall of the Supreme Court, which depicts Moses carrying the Ten Commandments alongside Confucius, Mohammed, Caesar Augustus, William Blackstone, Napoleon Bonaparte and John Marshall because it does not convey the message that the Ten Commandments are the only precedent legal code of the State) (citing *Allegheny,* 492 U.S. at 652-53 (Stevens, J., concurring in part and dissenting in part) (noting that Supreme Court's friezes convey a message of "respect not for great proselytizers but for great lawgivers")). Accordingly, a court examines the same factors (content, context and the evolution of the displays) to assess the nature of the governmental purpose, regardless of whether the display is in a school building or a courthouse.

The district court failed to apply these legal standards to Defendants' second and third articulated purposes, dismissing them without sufficient analysis. Nevertheless, as discussed below, the undisputed evidence in the record concerning the content and context of the displays, as well as the evolution of the displays, demonstrates that the district court did not clearly err in finding that Defendants' actual purposes were religious. Further, although the district court's legal analysis of Defendants' fourth and fifth articulated purposes was more substantive, it, too, was incomplete. Again, however, any flaws in the district court's reasoning were not outcome-determinative because the displays' content, particularly when viewed in light of Defendants' past attempts to display the Ten Commandments in a blatantly religious manner, showed that Defendants' predominate purpose for the displays was religious.

### i. Content of the displays

#### a)   School displays

The School Board's display of, *inter alia,* the Star Spangled Banner, the Declaration of Independence, the Mayflower

Compact, the Bill of Rights, the Magna Carta, the National Motto and the Preamble to the Kentucky Constitution was accompanied by a School Board Resolution ("the Resolution"), the only document that purported to explain the significance of the documents. The Resolution stated, in part:

> We believe these … documents positively contribute to the educational foundations and moral character of students in our schools. … [I]t is our opinion that these … documents, taken as a whole, are valuable examples of documents that may instill qualities desirable of the students in our schools, and have had particular historical significance in the development of this country.

The Resolution provided the sole source of commentary about the documents in the display.

Even a generous reading of the Resolution reveals that the Ten Commandments are not integrated with a secular study of American law or government. The Resolution merely asserts, without further elaboration, the School Board's "belie[f]" and "opinion" that the documents, including the Ten Commandments, have educational and moral value, as well as historical significance. It is difficult to determine what subject, if any, the display even purports to study.

Moreover, the Resolution in no way connects the Ten Commandments with the other historical documents. The likely explanation for this phenomenon is that the "Ten Commandments are undeniably a sacred text in the Jewish and Christian faiths," *Stone,* 449 U.S. at 41, and the other historical documents are not. As the Supreme Court has observed, "the first part of the Commandments concerns the religious duties of believers: worshipping the Lord God alone, avoiding idolatry, not using the Lord's name in vain, and observing the Sabbath Day." *Id.* at 42 (citing Exodus 20: 1-11; Deuteronomy 5: 6-15). None of the other historical documents concern the religious duties of those who believe in God. Nor do these documents discuss the Ten

Commandments' requirement to honor parents or the prohibitions against killing, committing adultery, stealing, bearing false witness and coveting.

The Ten Commandments themselves are contained in an excerpt from the Congressional Record, which reprints a Joint Resolution of Congress declaring 1983 to be "Year of the Bible." (J.A. 208.) The fact that the Ten Commandments appear in a historical governmental publication, such as the Congressional Record, however, does not "secularize" the Ten Commandments. Rather, the question is whether the language of the Congressional Record excerpt integrates the Ten Commandments with an objective discussion of a secular subject matter. It clearly does not. The excerpt, like the School Board's Resolution, asserts an opinion (that of a Representative) that "it would serve an educational purpose for our citizens to become familiar with the important role which the Bible and Ten Commandments have played in molding our American traditions and laws." (J.A. 208.) The excerpt, however, never explains the connection between the Ten Commandments and American traditions. The Joint Resolution itself makes assertions about the role of the Bible in forming the United States and inspiring the Declaration of Independence and the Constitution of the United States. It then concludes with the following statements:

> Whereas the history of our Nation clearly illustrates the value of voluntarily applying the teachings of the Scriptures in the lives of individuals, families, and societies;
> …
> Whereas that renewing our knowledge of and faith in God through Holy Scriptures can strengthen us as a Nation and a people; Now, therefore, be it
>
> *Resolved by the Senate and House of Representatives of the United States of America in Congress assembled,* That the President is authorized and requested to designate 1983 as a national "Year of the Bible" in

recognition of both the formative influence the Bible has been for our nation, and our national need to study and apply the teaching of the Holy Scriptures."

(J.A. 208.) In short, Defendants' public school displays of the Ten Commandments are contained within a text that exhorts Americans to acknowledge the Bible as "the Word of God" and to apply the teachings of the Bible to their lives. The message is patently religious and in no way resembles an objective study of the role that the Ten Commandments, or even the Bible generally, played in the foundation of the American government.

### b) Courthouse displays

The courthouse displays of the Star Spangled Banner, the Declaration of Independence, the Mayflower Compact, the Bill of Rights, the Magna Carta, the National Motto, the Preamble to the Kentucky Constitution, the Ten Commandments and Lady Justice were preceded by a one-page prefatory description of the documents entitled "The Foundations of American Law and Government Display." The prefatory description of the Ten Commandments is limited to the following:

> The Ten Commandments have profoundly influenced the formation of Western legal thought and the formation of our country. That influence is clearly seen in the Declaration of Independence, which declared that, "We hold these truths to be self-evident, that all men are created equal, that they are endowed by their Creator with certain unalienable Rights, that among these are Life, Liberty, and the pursuit of Happiness." The Ten Commandments provide the moral background of the Declaration of Independence and the foundation of our legal tradition.

Although a bit different in form from the school displays, the courthouse displays of the Ten Commandments suffer from

the same fundamental flaw – the lack of a demonstrated analytical or historical connection with the other documents.

As noted, the prefatory document asserts a connection between the Ten Commandments and "the formation of our country" and "our legal tradition." To support this thesis, the preface cites to the "clear[]" influence that the Ten Commandments had on the Declaration of Independence. It is not facially apparent, and the preface offers no explanation, how the quotation from the Declaration is in any way connected with the Ten Commandments, which say nothing about men being created equal and with the rights to life, liberty and the pursuit of happiness. The only facial similarity between the two documents is that they both recognize the existence of a deity. The concept of a deity, however, is by no means unique to the Ten Commandments or even the Judeo-Christian tradition. Thus, this solitary similarity hardly demonstrates how the Ten Commandments *in particular* influenced the writing of the Declaration and, hence, the foundation of our country and legal tradition.

To buttress this alleged connection, Defendants have proffered evidence that each of the Ten Commandments was codified, to one extent or another, into the legal codes of some American Colonies, and that some of the Commandments (such as prohibitions against stealing, perjury and killing) persist to this day in American legal codes. Specifically, Defendants cite to a 1610 Virginia law requiring its leaders to give "allegiance" to God;  a 1680 New Hampshire law barring idolatry; a 1610 Virginia law and a 1639 Connecticut law against taking God's name in vain; laws from the 1600's and 1700's recognizing the Sabbath; a 1642 Connecticut law exhorting children to honor their parents; laws prohibiting killing; laws from the 1600's and 1700's prohibiting adultery; laws against stealing; and anti-perjury laws that prohibit bearing "false witness." Defendants cite to no particular law that prohibits "coveting."

The problem with this evidence and Defendants' accompanying argument is two-fold. One, the evidence does not appear in the actual display of the Ten Commandments, so an observer would not actually be made aware of these facts – a phenomenon equally relevant to the discussion of the "endorsement" issue below. Two, even assuming that the Ten Commandments are the sole or primary source of some laws codified by certain Colonies and State legislatures, this "fact" is irrelevant to the fundamental assertion in the display that the Ten Commandments clearly influenced the creation of the *Declaration of the Independence* and, thus, the formation of our country and legal tradition. The dissent expends a considerable amount of effort discussing "the influence of religion upon American law." We have no reason to doubt the existence of such an influence, but that is not the issue in this case. Even granting that religion in general influenced the development of our country and our legal traditions, we cannot simply take judicial notice of the very different and very specific claim that the Ten Commandments profoundly influenced the drafting of the Declaration of Independence. An assertion of such a connection is not evidence of such a connection. Thus, the dissent's discussion, like Defendants' evidence, simply misses the mark.

The Court finds it significant that neither Defendants nor the dissent have attempted to buttress the historical claim that the prefatory document makes about the Ten Commandments' foundational role in the drafting of the Declaration of Independence. To be sure, "[t]he fact that the Founding Fathers believed devotedly that there was a God and that the unalienable rights of man were rooted in Him is clearly evidenced in their writings, from the Mayflower Compact to the Constitution itself." *Abington Sch. Dist.,* 374 U.S. at 213. There is by no means a consensus, however, that the source of Thomas Jefferson's belief in divinely-bestowed, unalienable rights, to the extent this belief inspired the writing

of the Declaration,[5] was the Ten Commandments or even the Bible. One historian has noted that Jefferson believed in the "watchmaker God of deism … who established the laws of nature in the material universe at the time of creation and then left it alone." Allen Jayne, *Jefferson's Declaration of Independence: Origins, Philosophy and Theology* 24 (1998). He therefore posits that the "Nature's God" Jefferson referenced in the Declaration was not the God of the Bible (and thus the Ten Commandments), but the God of deism.[6] Further, several historians have concluded that Jefferson was most inspired by contemporaneous political writings as well as the musings of European philosophers and writers.[7]

---

[5]The Continental Congress appointed a committee of five to decide who would write the Declaration. Pauline Maier, *American Scripture* 99 (1998). The committee assigned Jefferson the task of drafting the document. *Id.* at 100. The draft was revised based on comments from Benjamin Franklin and John Adams. *Id.* at 100-02. After incorporating their comments, Jefferson reported the revised draft to the Congress. *Id.* at 100. Once in Congress, the Declaration was revised by other men. *Id.* at 105.

[6]*Id.* at 19 ("Jefferson's heterodox religious views were founded on an Enlightenment outlook in general and the writings of Henry St. John, Lord Viscount Bolingbroke, in particular. It is the God of his heterodoxy that appears in the Declaration of Independence rather than the God of the Bible."); *id.* at 38 ("Jefferson's God of the Declaration is … antithetical to any God who would manifest partiality by choosing one people or nation over others, as did the God of the Old Testament."). Jayne also quotes a letter written by Jefferson in which he expressed doubt about the origin and authenticity of the Ten Commandments. *Id.* at 34 ("'[T]he whole history of these books [containing the Ten Commandments] is so defective and doubtful, that it seems vain to attempt minute inquiry into it; and such tricks have been played with their text, and with the other texts of other books relating to them, that we have a right from that cause to entertain much doubt what parts of them are genuine.'") (quoting January 24, 1824, letter from Jefferson to John Adams).

[7]*See* David McCullough, *John Adams* 121 (2001) (noting that Jefferson borrowed from his previous writings, as well as the writings of George Mason and Pennsylvania delegate James Wilson; further noting that Jefferson was "drawing on long familiarity with the seminal works of

Defendants have not cited the Court to a single historical source in support of the proposition that the Ten Commandments inspired the drafting of the Declaration of Independence.

Although this Court has neither the ability nor the authority to determine the "correct" view of American history, it is our role to recognize that (a) Defendants' displays provided the viewer with no analytical or historical connection between the Ten Commandments and the other historical documents; and (b) Defendants have made no attempt in this litigation to support the displays' historical assertions with relevant and credible evidence. The Court's reference to historical sources is intended merely to illuminate these fundamental deficiencies in Defendants' argument and to suggest that an objective presentation of the Ten Commandments would at least take into account the abundant historical evidence regarding the sources that influenced the drafters of the Declaration of Independence.[8] Contrary to the dissent's

---

the English and Scottish writers John Locke, David Hume, Francis Hutcheson, and Henry St. John Bolingbroke, or such English poets as Defoe"); Maier, *supra* note 5, at 104 (noting evidence that Jefferson hastily produced a draft of the Declaration in a day or two and adapted two texts to complete a draft in this short time-frame: the preamble to the Virginia Constitution, "which was itself based on the English Declaration of Rights," and a preliminary version of the Virginia Declaration of Rights that had been drafted by George Mason); *id.* at 136 (noting that the Declaration's reference to "the laws of nature and nature's god" parallels the laws applicable to "individuals in a state of nature, a point, incidentally, that John Locke made explicitly in his *Second Treatise of Government*"); Carl Becker, *The Declaration of Independence: A Study in the History of Ideas* 79 (1922) (noting that with respect to "the political philosophy of Nature and natural rights" referenced in the Declaration that the "lineage is direct: Jefferson copied Locke"); Jayne, *supra,* at 44 (noting "the similarity of many of the provisions of [Locke's] *Second Treatise* with those of the Declaration, which clearly shows that Jefferson not only had extensive knowledge of Locke's work but put it to use in drafting the Declaration").

[8]*See, e.g.,* note 7, *supra.*

assertion, we do not "envision a display that contains a recounting of the history of the nation's founding [or] a summary of American constitutional law and history." We do envision, however, a display that does not go out of its way to stress the proposition that the Ten Commandments formed the foundation of the Declaration of Independence while utterly ignoring (and implicitly denying) all other influences. It is up to Defendants to determine the most efficient manner of integrating the Ten Commandments with an objective historical display.

### c)   Summary

In sum, the very text in which the Ten Commandments are contained in the schoolhouse displays manifests a patently religious purpose. Defendants' courthouse displays also manifest a religious purpose because they utterly fail to integrate the Ten Commandments with a secular subject matter. When distilled to their essence, the courthouse displays demonstrate that Defendants intend to convey the bald assertion that the Ten Commandments formed the foundation of American legal tradition. The Supreme Court has held, however, that "such an 'avowed' secular purpose is not sufficient to avoid conflict with the First Amendment" when no effort has been made to integrate the Ten Commandments with a discussion or display of a secular subject matter. *Stone,* 449 U.S. at 41. Since Defendants' displays make no such effort, the district court correctly concluded that Defendants' primary purpose was religious.

This Court's decision in *Adland,* which was rendered after the district court's decision, further supports its conclusion. In *Adland*, a Kentucky law directed the Department for Facilities Management to "relocate the monument inscribed with the Ten Commandments which was displayed on the Capital grounds for nearly three decades to a permanent site on the Capital grounds near Kentucky's floral clock to be made part of a historical and cultural display including the display of [the law] to remind Kentuckians of the Biblical

foundations of the laws of the Commonwealth." *Id.* at 474-75. In finding that the stated purpose of the law, "to remind Kentuckians of the Biblical foundations of the laws of the Commonwealth," failed the secular purpose prong of the *Lemon* test, this Court concluded that "this avowed secular purpose, which is essentially the same secular purpose that the Commonwealth of Kentucky put forth in *Stone*, is insufficient, standing alone, to satisfy the secular purpose requirement." *Id.* at 481 (citing *Stone*, 449 U.S. at 42). The Court further opined:

> While the Commonwealth need not commemorate every arguable historical influence on the laws of the Commonwealth or keep current with the views of every scholar to ensure compliance with the Establishment Clause, we cannot ignore its decision to focus only on the "Biblical foundations" of the law. … [I]n addressing the Commonwealth's avowed secular purpose for displaying an overtly religious symbol such as the Ten Commandments, we cannot ignore the Commonwealth's adoption of a view that emphasizes a single religious influence to the exclusion of all other religious and secular influences.

*Id.* at 481-82 (citation omitted).

Like the display in *Adland*, Defendants' courthouse displays assert that the Ten Commandments provide "*the* moral background of the Declaration of Independence and *the* foundation of our legal tradition." (J.A. 161) (emphases added). The displays emphasize a single religious influence, with no mention of any other religious or secular influences. This fact confirms the rectitude of the district court's conclusion that Defendants' purposes were religious.

### ii.   Context of the displays

The "intended physical context" of the Ten Commandment displays also is relevant to a determination of the primary

purpose behind them.  *Adland,* 307 F.3d at 481.  Here, the displays did not provide undue physical emphasis to the Ten Commandments.  In both the school and courthouse displays, the Ten Commandments appeared on a single piece of paper, the same size as that containing the secular documents.  With that said, sandwiching the Ten Commandments between secular texts does not necessitate a finding that the primary purpose of the displays is secular.  *See Indiana Civil Liberties Union v. O'Bannon,* 259 F.3d 766, 771 (7th Cir. 2001) ("[T]he display of secular texts along with the Ten Commandments does not automatically lead to a finding that the purpose in erecting the monument is primarily secular.").  Thus, where the content of the displays otherwise indicates a predominate religious purpose, the fact that the Ten Commandments are not physically prominent is not dispositive.

A finding of religious purpose is militated by the blatantly religious content of the displays.  The displays do not present a "passive symbol" of religion like a crèche, which, when accompanied by secular reminders of the holiday season, has come to be associated more with the public celebration of Christmas, rather than that holiday's religious origins.  *Lynch,* 465 U.S. at 686.  Instead, the Ten Commandments are an active symbol of religion because they "concern[] the religious duties of believers:  worshipping the Lord God alone, avoiding idolatry, not using the Lord's name in vain, and observing the Sabbath Day."  *Stone,* 449 U.S. at 42 (Biblical citations omitted).  The Ten Commandments "are undeniably a sacred text in the Jewish and Christian faiths," *id.* at 41, and, therefore, are "still an inherently religious text." *Indiana Civil Liberties Union,* 259 F.3d at 771.  As such, Defendants had to exercise special care to present the Ten Commandments objectively and as an integral part of a non-religious message.  As discussed above, Defendants failed in this endeavor.

### iii.   Evolution of the displays

Defendants' conduct from the time it created the Ten Commandments displays throughout the time it modified the displays is relevant to determining their primary purpose. The Supreme Court made this legal principle abundantly clear in *Santa Fe Indep. Sch., supra.*   That case involved a challenge to a policy of student-led prayer at high school football games.  Prior to 1995, the school district's policy authorized a student elected as "Student Chaplain" to deliver a prayer over the public address system before each game. After several students and their parents filed suit challenging the policy under the Establishment Clause, the school district adopted a different policy in August 1995.  The policy, entitled "Prayer at Football Games," authorized two student elections, the first to determine whether "invocations" and "benedictions" should be delivered at games, and the second to select the spokesperson to deliver them.  *Santa Fe Indep. Sch.,* 530 U.S. at 297.  The policy omitted any requirement that invocations and benedictions be nonsectarian and nonproselytising, but contained a fallback provision that automatically added the provision if the preferred policy should be enjoined.  *Id.*   The policy was changed again in October 1995 to omit the word "prayers" from the title, and to refer to "messages" and "statements" as well as "invocations."  *Id.* at 298.

In holding that the school district had run afoul of the Establishment Clause by sponsoring a religious message, the Court looked, among other things, to "the evolution of the current policy from the long-sanctioned office of 'Student Chaplain' to the candidly titled 'Prayer at Football Games' regulation."  *Id.* at 309.  The Court held that "[t]his history indicates that the District intended to preserve the practice of prayer before football games."  *Id.* Later in its decision, the Court held that the school district's history of noncompliance with the Establishment Clause not only could be considered, but had to be considered, in determining whether the school

district's latest iteration of the challenged policy was constitutional. As the Court stated:

This case comes to us as the latest step in developing litigation brought as a challenge to institutional practices that unquestionably violated the Establishment Clause. One of those practices was the District's long-established tradition of sanctioning student-led prayer at varsity football games. The narrow question before us is whether implementation of the October policy insulates the continuation of such prayers from constitutional scrutiny. It does not. Our inquiry into this question not only can, but must, include an examination of the circumstances surrounding its enactment. . . . Our discussion in the previous sections . . . demonstrates that in this case the District's direct involvement with school prayer exceeds constitutional limits.

The District, nevertheless, asks us to pretend that we do not recognize what every Santa Fe High School student understands clearly—that this policy is about prayer. The District further asks us to accept what is obviously untrue: that these messages are necessary to "solemnize" a football game and that this single-student, year-long position is essential to the protection of student speech. We refuse to turn a blind eye to the context in which this policy arose, and that context quells any doubt that this policy was implemented with the purpose of endorsing school prayer.

*Id.* at 315.

This Court similarly has held that a government's earlier policies or practices involving religious speech are relevant when determining the primary purpose behind a revised policy that ostensibly is designed to address earlier violations of the Establishment Clause. In *Adland,* this Court was faced with a Kentucky statute that compelled the location of a monument inscribed with the Ten Commandments on the grounds of the state capitol, near a floral clock. *Adland,* 307

F.3d at 474-75. The statute was silent with regard to any other contents of the display. In the course of litigation, Kentucky "clarifie[d]" that the display would consist of other "markers, signs and monuments," including a sign commemorating a Civil War event, a "Welcome to Kentucky" plaque, a prisoner of war marker and markers for other civic leaders. *Id.* at 477. The Court found Kentucky's litigation-inspired "clarification" to its Ten Commandments display, which originally consisted only of the Ten Commandments monument and a clock, to be probative of the Commonwealth's religious purpose:

[T]he Commonwealth did not reveal the contents of this display until it was in the midst of litigation. In our view, this indicates that the other components of the display are an afterthought, at best, secondary in importance to the Ten Commandments, and suggests that the Commonwealth acted with a predominantly religious purpose.

*Id.* at 481.

Contrary to Defendants' argument, this Court's decision in *Granzeier, supra,* does not deem Defendants' past unconstitutional displays of the Ten Commandments irrelevant to the primary purpose behind the latest version of the displays. The issue in *Granzeier* was whether the closing of county and state courts and offices on Good Friday violated the Establishment Clause. At one point, an employee of one of the county defendants, "acting without knowledge or authorization of any defendant, made signs bearing an image of the Crucifixion and announcing that the building would be closed 'for observance of Good Friday.'" *Granzeier,* 173 F.3d at 571. When the county was sued, it removed the signs from the courthouse and put up new signs announcing that the building would be closed; at the time of the litigation, the defendants referred to the Friday before Easter as "Spring Holiday." *Id.* The plaintiffs argued that the original sign showed that the defendants intention to close for

a Spring holiday on the Friday before Easter was a "sham." *Id.* at 574.

This Court rejected the plaintiffs' argument because it saw "no reason that Defendants' policy here, *if otherwise constitutional*, should not remain so after an unauthorized employee posted an unconstitutional sign for a few days." *Id.* (emphasis added). The sign did not permanently taint all future closings for a Spring holiday because the evidence showed that the recognition of Good Friday as a secular Spring holiday was "otherwise constitutional."[9] Importantly, *Granzeier* did *not* hold that evidence of past unconstitutional conduct is never probative evidence of present unconstitutional conduct. Rather, it held that where the remaining evidence shows that the government policy is "otherwise constitutional," past unconstitutional conduct does not preclude a finding of constitutionality. This holding is consistent with the Supreme Court's direction in *Santa Fe Indep. Sch.* that courts can, and must, look to prior unconstitutional practices when determining the primary purpose behind the government's present practices.

In looking to the context and history of Defendants' Ten Commandments displays, the court below found that "the history of these displays indicates that the defendants' overall purpose is religious in nature: to display the Ten Commandments." *McCreary II, supra* note 1, at 849. The district court, therefore, held that Defendants fourth and fifth purported secular purposes (to educate citizens regarding some of the documents that played a significant role in the foundation of the American and Kentucky systems of law and government) were primarily religious. *Id.* at 850. The district

---

[9]The evidence showed that Good Friday had become a holiday with significant "secular effects" (e.g., absent school children, high traffic volume from vacationers, and low activity at public offices and courts) and, therefore, the recognition of Good Friday as a secular holiday was permissible in the same way that Christmas Day and Thanksgiving are so recognized. *Id.* at 574-76.

court found it "significant" that Defendants' original displays, containing only the Ten Commandments, "were erected in violation of the Supreme Court's clear ruling in *Stone.*" *Id.* at 849-50 (footnote omitted). "This defiance," according to the district court, "imprinted the defendants' purpose, from the beginning, with an unconstitutional taint observed not only by this court, but by anyone acquainted with this litigation." *Id.* at 850 (footnote omitted). The district court's finding is consistent with the Supreme Court's decision in *Santa Fe Indep. Sch.*, which compels courts to consider the government's past violations of the Establishment Clause when evaluating its present conduct, and with this Court's *Adland* decision, which authorizes courts to rely on evidence of such prior violations as proof that subsequently-added, secular components of an otherwise-unconstitutional display are an "afterthought."

The district court further noted that Defendants' amended displays (which were the subject of the court's original preliminary injunction) "accentuated the defendants' religious purpose, rather than diminishing it, by posting the Commandments along with "specific references to Christianity and texts that, while promulgated by the federal government, were chosen solely for their religious references." *McCreary II, supra* note 1, at 850 (citing *Pulaski*, 96 F. Supp. 2d at 699). Again, the district court was correct in concluding that the evolution of Defendants' Ten Commandments displays bore directly on the primary purpose behind the ultimate versions of the displays.

Based on "the history of the government's involvement in these displays," the district court held that the final version of the displays which portrayed the Ten Commandments alongside the full text of various historical documents and was erected allegedly "to educate the citizens of McCreary and Pulaski Counties and the schoolchildren of Harlan County regarding the history of this nation's law and government," actually was done for a non-secular purpose. *Id.* The Court agrees with the district court insofar as the

history of Defendants' involvement with the displays strongly indicated that the primary purpose was religious. This Court is concerned, however, that the district court appeared to afford exclusive weight to Defendants' past conduct without addressing the specific content of the revised displays. Nevertheless, as discussed in detail above, the content of the modified displays patently evidence a religious purpose, and the district court recognized as much in its subsequent discussion of the "endorsement" prong. *See id*. at 851. Accordingly, the district court did not clearly err in finding that Defendants' fourth and fifth avowed secular purposes – to educate citizens regarding some of the documents that played a significant role in the foundation of the American and Kentucky systems of law and government – fail the first prong of the *Lemon* test. For the same reasons, the district court did not clearly err in finding that Defendants' first three avowed secular purposes, which specifically mention the Ten Commandments, were predominated by a religious purpose.

Although the inquiry into the constitutionality of the displays could end here, inasmuch as failure under any one of the *Lemon* prongs deems governmental action violative of the Establishment Clause, *see Edwards*, 482 U.S. at 583, we shall address the "endorsement" prong of *Lemon* because the district court addressed the second prong as well.

### b.   "Endorsement" Prong of the *Lemon* Test

In determining whether Defendants' displays impermissibly endorse religion, this Court must ask "whether an objective observer, acquainted with the text, legislative history, and implementation" of the displays would view them as state endorsement of religion. *Santa Fe Indep,. Sch. Dist.*, 530 U.S. at 308 (citations omitted); *Capital Square Review & Advisory Bd.*, 243 F.3d at 302. "In making this inquiry, [this Court] do[es] not allow a state 'to hide behind the application of formally neutral criteria and remain studiously oblivious to the effects of its actions.'" *Adland*, 307 F.3d at 484 (quoting *Pinette*, 515 U.S. at 777). In addition, the inquiry must be

viewed under the "totality of the circumstances surrounding the display." *Books*, 235 F.3d at 304. As a result, the Court must "look to both the specific content of the display and the context of its presentation." *Adland,* 307 F.3d at 484 (citing *Allegheny,* 492 U.S. at 598).

The Supreme Court decisions involving Christmas-time crèche displays demonstrate how the failure to integrate religious symbols with an overall secular theme can result in the impermissible endorsement of religion. In *Allegheny, supra,* the Court noted that "the crèche itself is capable of communicating a religious message." *Allegheny,* 492 U.S. at 598. The Court struck down a courthouse crèche display because nothing in the context of the display detracted from the crèche's religious message. *Id.* The Court distinguished the display from the one at issue in *Lynch, supra,* which had been composed of a "series of figures and objects, each group of which had its own focal point." *Id.* The *Lynch* display had included numerous purely secular symbols, such as a Santa Claus house, a lighted Christmas tree, a "talking" wishing well, a miniature village, a banner proclaiming "SEASONS GREETINGS," and candy-striped poles. *Lynch,* 465 U.S. at 671. In *Allegheny,* by contrast, "the crèche [stood] alone: it [was] the single element of the display" in the courthouse, thereby sending "an unmistakable message that [the county] supports and promotes the Christian praise to God that is the crèche's religious message." *Allegheny,* 492 U.S. at 598-99. Thus, the crèche display in *Lynch* was permissible because the symbols shared a common secular link – the holiday season[10] – and the arrangement of the symbols conveyed that link to the display's observers. This secular link overcame any religious message that any one component of the display (i.e., the crèche) might otherwise have conveyed on its own.

---

[10] *Cf. Allegheny,* 492 U.S. at 596 (noting that Christmas is "a holiday with strong secular elements") (citing *Lynch,* 465 U.S. at 692 (O'Connor, J., concurring)).

The dissent appears to read *Lynch* and *Allegheny* to hold that a symbol which is wholly or partially religious no longer conveys its religious message when it is physically surrounded by wholly secular symbols. This overly-simplistic reading of the case law ignores the requirements that (a) the symbols be interconnected in a manner that is facially apparent to the observer and (b) the interconnection be secular in nature. For example, if Defendants in this case had substituted the Ten Commandments with a depiction of the Crucifixion or a religious sermon exhorting the citizenry to worship God and abide by the Ten Commandments, the religious messages would not have been subordinate to an overall secular theme simply because the religious document would have been surrounded by secular documents, such as the Declaration of Independence and the Magna Carta. Instead of blending in with an overall secular theme, the religious document, although physically contiguous, would have stood apart from the rest from a thematic point of view.

As to the composition of the displays in this case, the district court opined:

> The composition of the current set of displays accentuates the religious nature of the Ten Commandments by placing them alongside American historical documents. Given the religious nature of this document, placing it among these patriotic and political documents, with no other religious or moral codes of any kind, imbues it with a national significance constituting endorsement. The Ten Commandments are completely different from the remainder of the displays. The reasonable observer will see one religious code placed alongside eight political or patriotic documents, and will understand that the counties promote that one religious code as being on a par with our nation's most cherished secular symbols and documents. This is endorsement. . . . [T]he current set of displays conveys the counties' comment on the Ten Commandments' (and consequently, religion's) foundational value to our

> shared history as citizens; a reasonable person would perceive this message as endorsement.

*McCreary II, supra* note 1, at 851 (footnotes omitted). We agree with the district court's conclusion.

In *Books*, the Seventh Circuit held that "the placement of the American Eagle gripping the national colors at the top of the [Ten Commandments] monument hardly detracts from the message of endorsement; rather, it specifically links religion . . . and civil government." *Books*, 235 F.3d at 307. *See also Adland*, 307 F.3d at 486-87 (agreeing with the Seventh Circuit's holding in *Books* that "the inclusion of an American eagle gripping the national colors at the top of the monument, serves to heighten the appearance of government endorsement of religion"). Here, the same can be said of Defendants' transparent attempt to "secularize" the displays by surrounding the Ten Commandments with other patriotic documents and symbols, such as the Bill of Rights and the Preamble to the Kentucky Constitution. *See Indiana Civil Liberties Union*, 259 F.3d at 773 (holding that display consisting of Bill of Rights, Preamble to Indiana Constitution and Ten Commandments would signal to the reasonable observer "that the state approved of such a link, and was sending a message of endorsement") (citing *Books,* 235 F.3d at 307).

Ultimately, the displays convey a message of religious endorsement because of the complete lack of any analytical connection between the Ten Commandments and the other patriotic documents and symbols. A reasonable observer of the displays cannot connect the Ten Commandments with a unifying historical or cultural theme that is also secular. All of the other documents relate in some fashion to Western European or American culture since 1215; several of the documents are legal in nature, one is an American symbol, one is an American slogan and one is an American song. The Ten Commandments are several thousands of years old, were not a product of European or American culture and, many

believe, are the word of God. *See* Baruch J. Schwartz, *Ten Commandments,* in The Oxford Dictionary of the Jewish Religion, 683 (1997) (noting that in both Biblical accounts of the revelation of the Ten Commandments at Sinai, "[t]he 'Ten Words' were inscribed by God on the first set of Tablets given to Moses.") A reasonable observer would not be able to link all of these texts to the foundation of American law and government; the displays' mere assertion of such a link does not cure the problem any more than a disclaimer stating that the Ten Commandments has been "adopt[ed] as the fundamental legal code of Western Civilization and the Common Law of the United States." *Stone,* 449 U.S. at 40 n.1 (holding that such a disclaimer is not sufficient to avoid a conflict with the First Amendment). *See also Adland*, 307 F.3d at 488 (noting that "'no sign can disclaim an overwhelming message of endorsement'") (quoting *Allegheny*, 492 U.S. at 619). Upon seeing the Ten Commandments, which sticks out in the displays like a proverbial "sore thumb," a "reasonable person will think religion, not history." *Indiana Civil Liberties Union ,* 259 F.3d at 773 (holding that reasonable observer would not be able to make an analytical connection between Ten Commandments, Bill of Rights and Preamble to Indiana Constitution).

The district court further found that the location of the displays – in the McCreary and Pulaski County courthouses and Harlan County public schools – had "the effect of advancing religion." *McCreary II, supra* note 1, at 852. We agree. With regard to the school displays, it is noteworthy that the Supreme Court "has been particularly vigilant in monitoring compliance with the Establishment Clause in elementary and secondary schools." *Aguillard,* 482 U.S. at 583-84. This is because the public schools hold a position of trust that parents condition "on the understanding that the classroom will not purposely be used to advance religious views that may conflict with the private beliefs of the student and his or her family." *Id.* at 584. Public school students are especially impressionable due to the coercive power that the

State exerts through mandatory attendance requirements, "and because of the students' emulation of teachers as role models and the children's susceptibility to peer pressure." *Id.* (footnote and citations omitted). Thus, the presence of these displays in the schools enhances the underlying message of religious endorsement contained in the displays. As the Supreme Court has commented, if such displays "are to have any effect at all, it will be to induce the schoolchildren to read, meditate upon, perhaps to venerate and obey, the Commandments. However desirable this might be as a matter of private devotion, it is not a permissible state objective under the Establishment Clause." *Stone*, 449 U.S. at 42.

The citizenry exhibits a similar impressionability in the setting of a county courthouse, where the government carries out one of its quintessential functions – the enforcement of the civil and criminal laws. Typically, citizens are at the courthouse by necessity –whether they are on trial for a crime, have been subpoenaed as witnesses, are seeking to vindicate their civil rights, have been called to jury duty or are simply contesting parking tickets, registering to vote or renewing their driver's licenses. County courthouses also exude a coercive pressure, ranging from compulsory jury service to bench warrants to judicial decrees. Accordingly, a courthouse display of the Ten Commandments that conveys a religious message is nothing like a similar display in "a typical museum setting[;] though not neutralizing the religious content …, [the museum setting] negates any message of endorsement of that content." *Lynch,* 465 U.S. at 692 (O'Connor, J., concurring). As in *Books*, Defendants' courthouse displays posted at the seat of government, which "'is so plainly under government ownership and control' that every display on its property is marked implicitly with government approval." *Books*, 235 F.3d at 306 (quoting *Am. Jewish Congress v. City of Chicago*, 827 F.2d 120, 128 (7th Cir. 1987)).

Finally, the district court found that the history of the displays bolstered the reasonable observer's perception of the

state endorsement of religion inasmuch as the observer is charged with knowing the history of the respective displays, and in each case the history indicates that the displays were originally intended to enshrine the Ten Commandments; it was only upon fear of litigation that the displays were modified to include secular material in the hope of rendering the displays constitutional. *McCreary II*, *supra* note 1, at 852. We agree with the district in this regard as well. *See Santa Fe Indep,. Sch. Dist.*, 530 U.S. at 308 (crediting the objective observer with being "acquainted with the text, legislative history, and implementation" of the displays). As a result, this Court concludes that the district court did not clearly err in finding that the displays have the impermissible effect of endorsing religion.[11]

### 2.   Other Preliminary Injunction Factors

As Plaintiffs note in their brief, Defendants do not address the other three preliminary injunction factors on appeal and, therefore, have abandoned any argument as to these factors. However, because Plaintiffs have demonstrated a likelihood of succeeding on the merits of their Establishment Clause claim, the other three preliminary factors follow in favor of granting the injunction. *See Connection Distrib. Co.,* 154 F.3d at 288 (finding that "[w]hen a party seeks a preliminary injunction on the basis of a potential violation of the First Amendment, the likelihood of success on the merits often will be the determinative factor").

### III.
### CONCLUSION

For the above-stated reasons, the district court's order requiring the removal of the displays from the McCreary and

---

[11]The district court did not address the third *Lemon* factor and, therefore, neither shall we. As stated, failure under any one of the *Lemon* factors invalidates the challenged governmental action, and thus the third factor need not be addressed. *See Edwards*, 482 U.S. at 583.

Pulaski County courthouses and from the Harlan County schools is **AFFIRMED**.

## CONCURRENCE

JULIA SMITH GIBBONS, Circuit Judge, concurring. The district court's decision to grant plaintiffs-appellees' motion for a supplemental preliminary injunction enjoining the continued exhibition of the current displays was proper. With respect to the "secular purpose" prong of the test used to determine the constitutionality of the current displays, as set forth by the Supreme Court in *Lemon v. Kurtzman*, 403 U.S. 602 (1971), the majority opinion appropriately follows controlling precedent, and I generally agree with its application of the law to the facts of this case.

In light of the inherently religious nature of the Ten Commandments, defendants-appellants' failure to articulate a facially secular purpose until after litigation had commenced, the "overtly religious" quality of the second display, *Am. Civil Liberties Union of Kentucky v. McCreary County, Kentucky*, 145 F.Supp.2d 845, 850 n.19 (E.D. Ky. 2001), the absence of any evidence in the record indicating that the Ten Commandments have been or will be integrated into the school curriculum as part of an appropriate program of study, the absence of any discussion integrating the Ten Commandments into a secular subject matter other than a conclusory assertion about the Declaration of Independence, and the emphasis on the Ten Commandments as the only religious text in the displays, plaintiffs-appellees have shown a strong or substantial likelihood of success on the merits of their claim that the displays lack a secular purpose. I therefore concur in the result. I write separately, however, to emphasize that, as the majority opinion notes, "the inquiry into the constitutionality of the displays could end here, inasmuch as failure under any one of the *Lemon* prongs deems governmental action violative of the Establishment Clause." Consequently, I express no opinion as to whether

the displays violate the "effect/endorsement" prong of the *Lemon* test.

Finally, I offer two further observations relating to the dissenting opinion. First, the dissent concludes that the majority opinion questions a link between religion and our laws and government. In my view, the majority opinion says nothing whatsoever about this topic. Its subject is the application of the *Lemon* test to this particular case, and the only discussion to which the dissent could possibly refer in reaching this conclusion concerns defendants' failure to include in the displays any support for their conclusory assertion about the relationship between the Ten Commandments and the Declaration of Independence.

Second, the dissent seeks to characterize the majority opinion's descriptions of the facts on which its conclusion rests as statements of broad rules. For example, the dissent says that the majority opinion creates rules that the government may display the Ten Commandments in a public building only if they are integrated into a secular curriculum and that any display must include a narration of proof of the relationship between religion and the foundation of American law. In my view, this reading of the majority opinion is unjustified. Rather, the majority considers the lack of integration of the displays into a secular curriculum and the lack of recited proof of a relationship between the Ten Commandments and the Declaration of Independence as factors that support a lack of secular purpose *in this case* and considers these factors, along with other evidence in *this* record, in reaching its result.

## DISSENT

RYAN, Circuit Judge, dissenting. The majority holds that the displays mounted on the walls of the county courthouses in McCreary and Pulaski counties and in the school buildings in Harlan County, Kentucky, offend the Establishment Clause of the First Amendment of the United States Constitution, and it affirms the district court's order that the displays be removed. I disagree and, with respect, must dissent.

The defendants' displays comport with the requirements of the Constitution in every respect, as is clearly indicated by the Supreme Court's two landmark cases permitting the use of religious symbols on public property: *Lynch v. Donnelly*, 465 U.S. 668 (1984), and *County of Allegheny v. ACLU*, 492 U.S. 573 (1989). Rather than address these authorities in a meaningful fashion, the majority conjures a rule from the case of *Stone v. Graham*, 449 U.S. 39 (1980), a two-page, *per curiam* decision of the Court that preceded both *Lynch* and *Allegheny*, that was decided without the benefit of oral argument or briefs on the merits, and that bears no factual similarity to the case before us.

With one exception, the majority's analysis fails to properly apply the relevant Supreme Court precedent to the facts of the case before us. Inasmuch as my colleagues have expressed their disagreement with the reasoning that led the district court to conclude that the displays are unconstitutional, there is no need to point out why that is an eminently correct judgment. Nevertheless, having rejected much of the district court's analysis, the majority now affirms the judgment of that court by employing a wholly independent rationale that was not developed below and not presented to this court for review.

## I.

As the majority has correctly said, the controlling law in this case is the three-part "*Lemon* test" found in *Lemon v. Kurtzman*, 403 U.S. 602 (1971), as refashioned, it should be added, in *Lynch v. Donnelly*, 465 U.S. 668, and *County of Allegheny v. ACLU*, 492 U.S. 573. The *Lemon* test has proved difficult to apply in many Establishment Clause cases because its three elements are frequently ill-suited to ever more imaginative Establishment Clause challenges. Indeed, the Supreme Court has cautioned against mechanically applying the test to every Establishment Clause case, *Lynch*, 465 U.S. at 679, and has variously criticized, modified, and even ignored it. *See, e.g., Lamb's Chapel v. Ctr. Moriches Sch. Dist.*, 508 U.S. 384, 398-99 (1993) (Scalia, J., concurring) (citing cases).

Of the current members of the Supreme Court, six have criticized the *Lemon* test. For example, in *Wallace v. Jaffree*, 472 U.S. 38 (1985), then-Justice Rehnquist stated:

[T]he *Lemon* test has no more grounding in the history of the First Amendment than does the wall theory upon which it rests. The three-part test represents a determined effort to craft a workable rule from a historically faulty doctrine; but the rule can only be as sound as the doctrine it attempts to service.

*Id.* at 110 (Rehnquist, J., dissenting). Justice O'Connor once called the analysis under the *Lemon* test "problematic" and warned that there are "certain difficulties inherent in the Court's use of the test." *Corp. of the Presiding Bishop of the Church of Jesus Christ of Latter-Day Saints v. Amos*, 483 U.S. 327, 346 (1987) (O'Connor, J., concurring in the judgment). Justice Stevens has lamented "the sisyphean task of trying to patch together the 'blurred, indistinct, and variable barrier' described in *Lemon*." *Comm. for Pub. Educ. & Religious Liberty v. Regan*, 444 U.S. 646, 671 (1980)

(Stevens, J., dissenting).  Also registering his dissatisfaction with *Lemon*, Justice Kennedy stated:

> I . . . do not wish to be seen as advocating, let alone adopting, [the *Lemon*] test as our primary guide in this difficult area.  Persuasive criticism of *Lemon* has emerged.  Our cases often question its utility in providing concrete answers to Establishment Clause questions, calling it but a helpful signpos[t] or guidelin[e], to assist our deliberations rather than a comprehensive test. Substantial revision of our Establishment Clause doctrine may be in order.

*Allegheny*, 492 U.S. at 655-56 (Kennedy, J., concurring in the judgment in part and dissenting in part) (internal quotation marks and citations omitted).  Finally, Justice Thomas joined the refrain when he signed on to a dissent written by Justice Scalia, the Court's severest critic of *Lemon*, who had this to say about the much-maligned test:

> Our Religion Clause jurisprudence has become bedeviled (so to speak) by reliance on formulaic abstractions that are not derived from, but positively conflict with our long-accepted constitutional traditions. Foremost among these has been the so-called *Lemon* test, which has received well-earned criticism from many Members of this Court.

*Lee v. Weisman*, 505 U.S. 577, 644 (1992) (Scalia, J., joined by, *inter alios*, Thomas, J., dissenting) (citation omitted).

The Court has also modified the *Lemon* test by adopting Justice O'Connor's "endorsement test" from *Lynch*:

> [Justice O'Connor's] concurrence articulates a method for determining whether the government's use of an object with religious meaning has the effect of endorsing religion.  The effect of the display depends upon the message that the government's practice communicates:

> the question is "what viewers may fairly understand to be the purpose of the display."

*Allegheny*, 492 U.S. at 595 (quoting *Lynch*, 465 U.S. at 692 (O'Connor, J., concurring)).  The test has been further modified by "fold[ing] the entanglement inquiry into the primary effect inquiry." *Zelman v. Simmons-Harris*, 536 U.S. 639, 668 (2002) (O'Connor, J., concurring).

In some cases, the Supreme Court has simply ignored the *Lemon* test.  In *Larson v. Valente*, 456 U.S. 228 (1982), the Court, holding that Minnesota's charitable solicitation statute violated the Establishment Clause, stated that the "application of the *Lemon* tests is not necessary to the disposition of the case before us." *Id.* at 252.  Chief Justice Warren Burger, himself the author of *Lemon*, also declined to apply the test in an Establishment Clause challenge to Nebraska's practice of paying a chaplain to offer prayers at the opening of the state's legislative sessions.  *See Marsh v. Chambers*, 463 U.S. 783 (1983).

Not surprisingly, the Court has consistently emphasized that the *Lemon* test is not the *sine qua non* of Establishment Clause jurisprudence.  In *Mueller v. Allen*, 463 U.S. 388 (1983), the Court stated that the *Lemon* test "provides 'no more than [a] helpful signpos[t]'" in dealing with Establishment Clause challenges." *Id.* at 394 (quoting *Hunt v. McNair*, 413 U.S. 734, 741 (1973)).  And in *Lynch*, citing cases in which it did not utilize the *Lemon* test at all, the Court stated:  "[W]e have repeatedly emphasized our unwillingness to be confined to any single test or criterion in this sensitive area."  465 U.S. at 679.  In the *Lemon* case itself, the Supreme Court grappled with the question whether statutes in Pennsylvania and Rhode Island that authorized limited state financial aid to church-related schools violated the Establishment Clause.  The Court said they did, because neither statute could pass the new test Chief Justice Warren Burger conjured, mid-opinion, which provides:

First, the statute must have a secular legislative purpose; second, its principal or primary effect must be one that neither advances nor inhibits religion; [and] finally, the statute must not foster an excessive government entanglement with religion.

*Lemon*, 403 U.S. at 612-13 (internal quotation marks and citations omitted).

Over the years, the Supreme Court has broadened the test to apply not only to legislative enactments, but to any government action. For example, in *Widmar v. Vincent*, 454 U.S. 263 (1981), the Court applied the test to a university policy that excluded religious groups from a public forum. After experiencing considerable difficulty applying the test to various Establishment Clause challenges, especially its second part which proscribes government action whose primary effect either advances or inhibits religion, the Court modified that part of the test to prohibit government action that has the principal or primary effect of "endorsing" religion. *Allegheny*, 492 U.S. at 595 (citing *Lynch*, 465 U.S. at 691-94 (O'Connor, J., concurring)).

While judges, lawyers, and constitutional law scholars continue to criticize *Lemon*, and repeatedly urge the Supreme Court to fashion a new, more workable test for determining whether a unit of government has made a "law respecting an establishment of religion," U.S. Const. amend. I, we (the lower federal courts) are stuck with the three-part *Lemon* test, and we must apply it in this case.

Having done so, I conclude that the three displays the plaintiffs have challenged, easily and obviously pass the *Lemon* test, and that, perforce, my colleagues' conclusion to the contrary is mistaken.

## II.

The majority opinion has partially misstated the proper standard of review in this case. It is certainly true that we review a district court's decision to grant a preliminary injunction for an abuse of discretion. *Sandison v. Mich. High Sch. Athletic Ass'n*, 64 F.3d 1026, 1030 (6th Cir. 1995). However, in determining whether the district court abused its discretion, we review its findings of fact for clear error and its legal conclusions *de novo*. *Id.* Moreover, we will overturn a district court's decision to grant a preliminary injunction "if the district court relied upon clearly erroneous findings of fact, improperly applied the governing law, or used an erroneous legal standard." *Blue Cross & Blue Shield Mut. v. Blue Cross & Blue Shield Ass'n*, 110 F.3d 318, 322 (6th Cir. 1997). In this case, because the district court based its decision to grant the injunction on the legal conclusion that the displays failed the purpose and effect prongs of the *Lemon* test, that conclusion should properly be reviewed *de novo*.

## III.

What the district court and my colleagues have held unconstitutional is an arrangement of ten framed documents on the courthouse lobby walls in McCreary and Pulaski counties and in the Harlan County school buildings.

The courthouse displays consist of the following documents:

1.  The Star Spangled Banner;

2.  The Declaration of Independence;

3.  The Mayflower Compact;

4.  The Bill of Rights;

5.  The Magna Carta;

6. The National Motto;

7. The Preamble to the Kentucky Constitution;

8. The Ten Commandments;

9. A printed figure of the Lady Justice; and

10. An explanatory sign identifying the foregoing documents and stating that the entire display is of "documents that played a significant role in the foundation of our system of law and government."

In addition, the courthouse displays are prominently identified as: "Foundations of American Law and Government Display."

The Harlan County School Board display is essentially identical to the McCreary and Pulaski courthouse displays, except that it is not identified as the "Foundations of American Law and Government Display," and the Lady Justice document and the explanatory sign are omitted. In their places are the text of Kentucky Revised Statute § 158.195, authorizing the posting of historical displays, and a lengthy Harlan County School Board resolution, stating, among other things, that the "many documents [comprising the display], taken as a whole, have special historical significance to our community, our country, and our country's history." No one of the framed documents in any of the displays has, by its size or location in the arrangement, any greater prominence than any other.

The defendants claim their purposes were to assemble and post in the courthouse and school district buildings, an array of historical documents that, *taken together*, have the educational and patriotic value of illustrating some of the ideas and influences that "were part of the foundation of American Law and Government" and "played a significant role in the development, origins or foundations of American

or Kentucky law." *ACLU v. McCreary County* (*McCreary II*), 145 F. Supp. 2d 845, 848 (E.D. Ky. 2001) (internal quotation marks and citations omitted). They argue that these purposes are entirely secular.

The district court correctly summarized the defendants' secular purposes as follows:

1. To erect a display containing the Ten Commandments that is constitutional;

2. To demonstrate that the Ten Commandments are part of the foundation of American law and government;

3. To include the Ten Commandments as part of the display for their significance in providing the moral background of the Declaration of Independence and the foundation of our legal tradition;

4. To educate the citizens of the county regarding some of the documents that played a significant role in the foundation of our system of law and government; and

5. As designated by the Harlan School Board, to create a limited public forum on designated walls within the school district for the purpose of posting historical documents that played a significant role in the development, origins, or foundations of American and Kentucky law.

*See id.*

## IV.

Inquiry into the constitutionality of the defendants' displays must begin, as I have said, with the Supreme Court case of *Lemon v. Kurtzman*, 403 U.S. 602. That inquiry, of necessity, includes *Lynch v. Donnelly*, 465 U.S. 668, and *County of*

*Allegheny v. ACLU*, 492 U.S. 573, in which the Supreme Court directly addressed the issue of whether a government may display an inherently religious, even sectarian symbol, on public property. The Court held in both *Lynch* and *Allegheny* that a government may use a religious symbol to accomplish a secular purpose, if the symbol is displayed in a way that does not create an impression of endorsement in the mind of the reasonable observer. A review of the facts in this case indicates that the defendants have rigorously complied with the criteria established by the Court in both *Lynch* and *Allegheny*, and that their displays in no way constitute an establishment of religion.

## A.

The first question we must consider under the *Lemon* test is whether the government's display has a secular purpose. *Lemon*, 403 U.S. at 612. "A statute or practice that is motivated in part by a religious purpose may satisfy the first *Lemon* criterion so long as it is not motivated entirely by a purpose to advance religion." *ACLU v. City of Birmingham*, 791 F.2d 1561, 1565 (6th Cir. 1986).

Furthermore, the Supreme Court has informed us that we have "no license to psychoanalyze . . . legislators" and that we must refrain from ascribing improper motives to legislators who "express[] a plausible secular purpose." *Wallace*, 472 U.S. at 74. If the government offers an explanation of its purpose, that explanation is owed deference by the judiciary unless and until shown to be a "sham," for "[w]e must be cautious about attributing unconstitutional motives to state officials." *Chaudhuri v. Tennessee*, 130 F.3d 232, 236 (6th Cir. 1997).

Five legitimate secular purposes motivated the defendants to erect the displays in their current format. First, defendants desired to erect a display of the Ten Commandments that is constitutional. I find in this stated desire nothing that even hints at a primarily religious purpose,

much less a sham. Neither the Supreme Court, nor this court, nor any federal appellate court, insofar as I know, has ever suggested that displaying the Ten Commandments is an impermissible objective under the Establishment Clause. In fact, quite the contrary is true. As we stated on one occasion:

> [W]e believe that the Supreme Court's opinion in *Stone* and Justice Stevens' statements in *Allegheny* not only acknowledge that the Ten Commandments may be constitutionally displayed, they provide considerable guidance how they can be displayed.

*Adland v. Russ*, 307 F.3d 471, 489 (6th Cir. 2002), *cert. denied*, 123 S. Ct. 1909 (2003).

Similarly, there is no reason to doubt the legitimacy of the second and third secular purposes for the displays, namely, to demonstrate that the Ten Commandments were part of the foundation of American law and government, and to recognize the significance of the Ten Commandments in providing the moral and cultural background of the Declaration of Independence and the foundation of our legal tradition. With respect to these two iterations of the defendants' secular purposes, the majority singles out the Declaration of Independence and complains that "[t]here is by no means a consensus . . . that the source of Thomas Jefferson's belief in divinely-bestowed, unalienable rights, to the extent this belief inspired the writing of the Declaration, was the Ten Commandments or even the Bible." Maj. op. at 25. In fact, the majority seems to hold that no government could ever plausibly proclaim the religious heritage of this nation because the prevailing view among historians is that our founders were primarily inspired by secular influences. *See id.* Not only is this observation a complete *non sequitur*, it is highly debatable as an historical matter. But more significantly, the source of Thomas Jefferson's "belief in divinely-bestowed, unalienable rights" proclaimed in the Declaration of Independence is utterly immaterial, because it does not resolve the real issue before us today, which is

whether the defendants' avowed secular purposes are shams. The Declaration of Independence is not the sole source of evidence that religion, of which the Ten Commandments are a nearly universal symbol, was a significant influence upon the foundation of American law and government.   My colleagues' interesting diversion about Thomas Jefferson, the Declaration of Independence, and the Bible offers no basis whatever to conclude, as a matter of law, as my colleagues do, that the defendants' avowed secular purposes are shams.

The influence of religion upon American law and government is a fact of American history and politics that has been widely recognized by scholars, jurists, legislators, presidents, and, not least, the Founders themselves.

In his Farewell Address to the nation, George Washington stated that religion was not only a part of the foundation of our law and government, it was a necessity:

> Of all the dispositions and habits which lead to political prosperity, Religion and morality are indispensable supports.  In vain would that man claim the tribute of Patriotism, who should labour to subvert these great Pillars of human happiness, these firmest props of the duties of Men and citizens.  The mere Politician, equally with the pious man ought to respect and to cherish them.  A volume could not trace all their connections with private and public felicity. . . . Whatever may be conceded to the influence of refined education on minds of peculiar structure, reason and experience both forbid us to expect that National morality can prevail in exclusion of religious principle.

George Washington, Farewell Address (Sept. 19, 1796), *in* 1 *The Founder's Constitution* 681, 684 (Philip B. Kurland & Ralph Lerner eds., 1987).  Similarly Thomas Jefferson, in his First Inaugural Address, listed religion as one of the necessary sources of our nation's prosperity:

> [E]nlightened by a benign religion, professed, indeed, and practiced in various forms, yet all of them inculcating honesty, truth, temperance, gratitude, and the love of man; acknowledging and adoring an overruling Providence, which by all its dispensations proves that it delights in the happiness of man here and his greater happiness hereafter—with all these blessings, what more is necessary to make us a happy and a prosperous people?

Thomas Jefferson, First Inaugural Address (Mar. 4, 1801), *in id.* 140, 141.

In fact, in recognition of religion's foundational role in our law and government, both Thomas Jefferson and Benjamin Franklin independently proposed that the new American seal depict Moses leading Israel through the wilderness under the protection of God, with the motto, "Rebellion to Tyrants is Obedience to God."   James H. Hutson, *Religion and the Foundation of the American Republic* 50-51 (1998). Although the Continental Congress never accepted Jefferson's and Franklin's proposals, it did adopt a seal with numerous religious references.  "What is unmistakable . . . is the theistic framework in which the Continental Congress sought to have the world understand the creation of the American republic."   Derek H. Davis, *Religion and the Continental Congress, 1774-1789: Contributions to Original Intent* 144 (Oxford Univ. Press 2000).

Like Washington, the Continental Congress also drew the connection between religion and government.  On October 11, 1782, in a Thanksgiving proclamation near the end of the Revolutionary War, the Congress asked Americans

> to testify their gratitude to God for his goodness, by a cheerful obedience to his laws, and by promoting . . . the practice of true and undefiled religion, which is the great foundation of public prosperity and national happiness.

23 *Journals of the Continental Congress, 1774-1789*, 647 (Gaillard Hunt ed., Government Printing Office 1914). These same sentiments were expressed by the Congress the day after the First Amendment was proposed when it urged President Washington to proclaim "'a day of public thanksgiving and prayer, to be observed by acknowledging with grateful hearts the many signal favours of Almighty God.'" *See* Davis, *supra* at 89 (citation omitted).

President John Adams likewise described the importance of religion to the American system of government:

> As the safety and prosperity of nations ultimately and essentially depend on the protection and the blessing of Almighty God, and the national acknowledgment of this truth is not only an indispensable duty which the people owe to Him, but a duty whose natural influence is favorable to the promotion of that morality and piety without which social happiness can not exist nor the blessings of a free government be enjoyed.

John Adams, Fast Day Proclamation (Mar. 23, 1798), *in A Compilation of the Messages and Papers of the Presidents, 1789-1897*, 268, 268-69 (James D. Richardson ed., 1899).

These are only a few of the numerous statements by our early political leaders drawing the same conclusion as did the defendants in this case:  that religion played a foundational role in American law and government.  This is a conclusion, incidentally, that is widely accepted by scholars.  As one of the earliest observers of American political life, Alexis de Tocqueville recognized, religion is an essential component of American government:

> Religion in America takes no direct part in the government of society, but it must be regarded as the first of the political institutions; for if it does not impart a taste for freedom, it facilitates the use of it.  Indeed, it is in this same point of view that the inhabitants of the

> United States themselves look upon religious belief. I do not know whether all Americans have a sincere faith in their religion—for who can search the human heart?—but I am certain that they hold it to be indispensable to the maintenance of republican institutions.

Alexis de Tocqueville, *Democracy in America* 305-06 (Alfred A. Knopf, Inc. 1972) (1835).  De Tocqueville's observation is confirmed by historical scholarship:

> As intellectual heirs of a tradition which had entwined republicanism and Christian theism, New Englanders in the last two decades of the [eighteenth] century were unable to perceive religion as free from matters of civil government.  From ancient history they were convinced that "the state cannot stand without religion" and from their own experience that "Rational Freedom cannot be preserved without the aid of Christianity."

Nathan O. Hatch, *The Sacred Cause of Liberty:  Republican Thought and the Millennium in Revolutionary New England* 168 (Yale Univ. Press 1977) (footnotes and citations omitted). The distinguished jurist and professor of law, Thomas M. Cooley, also recognized the close relationship between religion and American law:

> It was never intended that by the Constitution the government should be prohibited from recognizing religion . . . .  The Christian religion was always recognized in the administration of the common law; and so far as that law continues to be the law of the land, the fundamental principles of that religion must continue to be recognized in the same cases and to the same extent as formerly.

Thomas M. Cooley, *The General Principles of Constitutional Law in the United States of America* 205-06 (The Lawbook Exchange 2000) (1880).

Relevant to our purposes here, the Supreme Court has repeatedly stated that there is a crucial link between religion and our laws and government, for "[w]e are a religious people whose institutions presuppose a Supreme Being." *Zorach v. Clauson*, 343 U.S. 306, 313 (1952). This link has been consistently celebrated by our political leaders from the founding to the present day and nowhere has this practice been questioned as fiercely as the majority does today. In fact, the majority's incredulity as to the avowed relationship between religion and our public life is unprecedented:

> There is an unbroken history of official acknowledgment by all three branches of government of the role of religion in American life from at least 1789. . . .
>
> Our history is replete with official references to the value and invocation of Divine guidance in deliberations and pronouncements of the Founding Fathers and contemporary leaders.

*Lynch*, 465 U.S. at 674-75.

With regard to the Ten Commandments, the legitimacy of the defendants' view of American history as expressed in their displays is supported by the Supreme Court's own appraisal of its Establishment Clause precedent:

> [I]n *Stone* . . . [our] decision forbidding the posting of the Ten Commandments did not mean that no use could ever be made of the Ten Commandments, or that the Ten Commandments played an exclusively religious role in the history of Western Civilization.

*Edwards v. Aguillard*, 482 U.S. 578, 593-94 (1987).

Moreover, every one of our sister circuits that has considered a challenge to the public display of the Ten Commandments has recognized its foundational role in

American law and government and, consequently, has declared that such displays can have a secular purpose.

Most recently, the Fifth Circuit in *Van Orden v. Perry*, No. 02-51184, 2003 WL 22664490 (5th Cir. Nov. 12, 2003), approved of a granite monument inscribed with the Ten Commandments and displayed at the Texas Capitol. Having concluded that the State had a valid secular purpose for the display, the court also affirmed the relationship between the Ten Commandments and American law:

> To say this is not to diminish the reality that it is a sacred text to many, for it is also a powerful teacher of ethics, of wise counsel urging a regimen of just governance among free people. The power of that counsel is evidenced by its expression in the civil and criminal laws of the free world. No judicial decree can erase that history and its continuing influence on our laws--there is no escape from its secular and religious character.

*Id.* at *7.

In *Freethought Society v. Chester County*, 334 F.3d 247 (3d Cir. 2003), the Third Circuit upheld the display of a bronze plaque inscribed with the Ten Commandments that hung alone on the exterior of a county courthouse. The county commissioners had stated at trial that they wanted to maintain the plaque, in part, because they believed that the Ten Commandments contributed to the development of American law. The court held that this was a "'non-sham' secular purpose" and that there was a

> well documented history . . . to the effect that the Ten Commandments have an independent secular meaning in our society because they are regarded as a significant basis of American law and the American polity.

*Id.* at 267.

The Eleventh Circuit recently approved of a court clerk seal that included an outline of two stone tablets inscribed with the Roman numbers I through X, because the Ten Commandments are a popularly recognized symbol of the law. *King v. Richmond County, Ga.*, 331 F.3d 1271, 1278 (11th Cir. 2003). In its consideration of the seal's secular purpose, the court was satisfied "that during the 1870s the outline of the Ten Commandments presumably would have enabled illiterate citizens to recognize the legal validity of documents displaying the Seal." *Id.*

The Seventh Circuit, while striking down as unconstitutional a large granite monument bearing an inscription of the Ten Commandments, situated on the Elkhart, Indiana, City Hall grounds, nonetheless noted:

> The display of a religious symbol still may, under certain circumstances, have a secular purpose. The text of the Ten Commandments no doubt has played a role in the secular development of our society and can no doubt be presented by the government as playing such a role in our civic order.

*Books v. City of Elkhart*, 235 F.3d 292, 302 (7th Cir. 2000).

The Tenth Circuit, using the *Lemon* test, approved of the display of a granite Ten Commandments monument at a city-county courthouse in Salt Lake City. *Anderson v. Salt Lake City Corp.*, 475 F.2d 29 (10th Cir. 1973). In doing so, the court stated that

> the Decalogue is at once religious and secular, as, indeed, one would expect, considering the role of religion in our traditions. . . .

> It does not seem reasonable to require removal of a passive monument, involving no compulsion, because its accepted precepts, as a foundation for law, reflect the religious nature of an ancient era. . . . [W]e cannot say

> that the monument, as it stands, is more than a depiction of a historically important monument with both secular and sectarian effects.

*Id.* at 33-34. Although *Anderson* predates the Supreme Court's decisions in *Stone*, *Lynch*, and *Allegheny*, neither the Supreme Court nor the Tenth Circuit has overruled *Anderson* and it remains good law. *See Summum v. Callaghan*, 130 F.3d 906, 912 n.8 (10th Cir. 1997).

Thus, in their reasoned judgment, our sister circuits that have had the opportunity to consider this question have unanimously declared the validity of the very same premise that the defendants advance here today: "The Ten Commandments have profoundly influenced the formation of Western legal thought and the formation of our country." This judgment is not precluded by any decision of this court, and, in fact, would seem to be welcomed by it. Having had the opportunity to consider the place of the Ten Commandments in our public life, we have never rejected the historical relationship between the Ten Commandments and our law and government. In *Adland v. Russ*, 307 F.3d 471, we struck down a Kentucky legislative resolution directing that a six-foot tall granite monument inscribed with the Ten Commandments be displayed on the lawn at the State Capitol. The monument, which was totally different from the display at issue here, was essentially a stand alone piece, save for an accompanying clock and some small plaques nearby. Notwithstanding our objections to the monument in that case, we explicitly acknowledged that the Commonwealth could cure the defects in the display. Although we declined to render an advisory opinion on the constitutionality of alternative displays, we applauded the plaintiffs for proposing "to their credit, . . . a historical display *showcasing the various influences on our law by both secular and religious sources.*" *Id.* at 489-90 (emphasis added).

This collection of sources is not intended to settle the issue of whether the Decalogue is in fact a foundational document

in American law and government, for that is not the question before us today.  What we must decide is whether the displays were motivated by a secular purpose.  In answering that particular question, our only concern is with the defendants' subjective belief, because government action will fail the purpose prong of the *Lemon* test if the "government intends to convey a message of endorsement or disapproval of religion."  *Lynch*, 465 U.S. at 691 (O'Connor, J., concurring).  Specifically, given the defendants' articulation of a secular purpose, we must consider whether such a purpose is a sham, *i.e.*, whether the defendants subjectively believed that the Decalogue was part of the foundation of American law and government and that it provided the moral background of the Declaration of Independence and the foundation of our legal tradition.

Not only is the record utterly devoid of any evidence that the defendants subjectively intended to convey a message of endorsement, but the historical evidence dispels any suspicion that the defendants' theory of American law and history is a sham.  In common, ordinary English usage, a sham means a fraud, a hoax, or an intentionally deceptive counterfeit.  *See* 15 Oxford English Dictionary 159 (2d ed. 1989).  Given the "unbroken history of official acknowledgment by all three branches of government of the role of religion in American life," *Lynch*, 465 U.S. at 674, and the consistent view of the courts that "[t]he text of the Ten Commandments no doubt has played a role in the secular development of our society," *Books*, 235 F.3d at 302, it cannot plausibly be said that the defendants' desire to demonstrate the foundational role of the Ten Commandments is a fraud or hoax.  The voluminous historical evidence, common sense, and the decisional law of the federal courts all lead to one inevitable conclusion in the case before us:  that the defendants' second and third articulated purposes are not shams and should, therefore, be accepted by this court as legitimate secular purposes.

Similarly, there is no evidence in the record that would justify this court in questioning the sincerity of the

defendants' fourth articulated purpose: to educate the citizens of the county regarding some of the documents that played a significant role in the foundation of our system of law and government.  The displays unquestionably contain numerous documents in "a historical display showcasing the various influences on our law by both secular and religious sources." *Adland*, 307 F.3d at 490.  Lest there be any confusion about the displays' educative purpose, the defendants have posted signs explaining that all the documents "played a significant role in the foundation of our system of law and government." The signs go on to describe in considerable detail the significance of each document, including the Ten Commandments, which, the defendants assert, "provide[d] the moral background of the Declaration of Independence and the foundation of our legal tradition."  As my earlier discussion of the historical evidence indicates, the defendants' purpose of educating their citizens about the relationship between religion and the American system of law and government is grounded in clear and indisputable fact and, as such, cannot be justifiably characterized as a sham.  In their assessment of the relationship between religion and the Declaration of Independence, the defendants got it absolutely right:

> [T]he numerous references to God were enough to place the Declaration in an overall theistic framework so as to satisfy virtually anyone who held a theistic worldview. Thus in drafting the Declaration of Independence, Thomas Jefferson and his congressional colleagues seized upon, and indeed helped to further shape, a bond between Enlightenment latitudinarianism and Christian orthodoxy that made it possible to formally dissolve all bonds with Great Britain and at the same time confidently assert "the protection of Divine Providence."

Davis, *supra* at 109.

Nevertheless, according to my colleagues, the displays in this case are defective because they "provided the viewer with no analytical or historical connection between the Ten

Commandments and the other historical documents," maj. op. at 27, and, thus, fail to prove conclusively the defendants' thesis: that the Decalogue has a historical connection to American law and government. The majority rejects the evidence, as it appeared in the defendants' brief, "that each of the Ten Commandments were codified, to one extent or another, into the legal codes of some American Colonies, and that some of the Commandments . . . persist to this day in American legal codes." Maj. op. at 24. In doing so the majority complains that this "evidence does not appear in the actual display of the Ten Commandments, so an observer would not actually be made aware of these facts." Maj. op. at 24. Thus, the majority seems to envision a display that contains a recounting of the history of the nation's founding, a summary of American constitutional law and history, perhaps a syllogism incorporating the foregoing, and, I suppose, at least as much evidence as was presented to this court in the official record of more than 200 pages.

In support of their reasoning, my colleagues cite *Stone v. Graham*, 449 U.S. 39 (1980) (*per curiam*), a case that the majority has both misapplied and misinterpreted and that, nevertheless, bears no factual relation to the case before us. *Stone* was a case about the constitutionality of a Kentucky statute mandating the posting of a copy of the Ten Commandments, standing *alone*, in every school classroom in Kentucky. Acting upon a petition for a writ of *certiorari*, and without benefit of oral argument or briefing on the merits, the Court, in a two-page, *per curiam* opinion from which four justices dissented, summarily reversed the Kentucky Supreme Court's judgment of constitutionality, stating:

> We conclude that Kentucky's statute requiring the posting of the Ten Commandments in public schoolrooms had no secular legislative purpose, and is therefore unconstitutional.

*Id.* at 41. Noting that the Court's holding was without precedent, then-Justice Rehnquist called the decision "a

cavalier summary reversal" having "no support beyond [the Court's] own *ipse dixit*." *Id.* at 43, 47 (Rehnquist, J., dissenting).

Although they cite no authority, my colleagues are apparently relying on *Stone* when they state that "a purported historical display must present the Ten Commandments objectively and integrate them with a secular message." Maj. op. at 18. If this is, in fact, the rule that my colleagues glean from *Stone*, it is not the rule they apply to the facts of the case before us. Rather, the defendants are faulted because they did not choose to display the Ten Commandments in "the most logical way," which the majority defines as "integrating the Ten Commandments with a secular curriculum, such as through the objective study of history, ethics or comparative religion." Maj. op. at 18. This is the actual standard by which my colleagues judge the defendants' displays. Accordingly, my colleagues condemn the defendants' displays because "the Ten Commandments are not integrated with a *secular study* of American law or government," maj. op. at 21 (emphasis added), and because of "the lack of a *demonstrated analytical or historical connection* with the other documents [in the displays]," maj. op. at 23 (emphasis added). These criticisms demonstrate that my colleagues think that it is no longer sufficient for a display to serve a secular purpose, for the majority now demands that such a display be "integrat[ed] . . . with a secular curriculum." Maj. op. at 18.

It should first be observed that there is no obligation to display the Ten Commandments in an otherwise secular exhibit in a way that appeals to the logic of scrutinizing federal judges. I am not aware of any authority that would require us to condemn a government display simply because it did not choose "the most logical way" of conveying a message. Furthermore, insofar as the majority relies on *Stone* for guidance in forming its rule that "a purported historical display must present the Ten Commandments objectively and integrate them with a secular message," maj. op. at 18, it is

better to quote this portion of *Stone* in full.  What the Court actually said in *Stone* was the following:

> This is not a case in which the Ten Commandments are integrated into the school curriculum, where the Bible may constitutionally be used in an appropriate study of history, civilization, ethics, comparative religion, or the like.

*Stone*, 449 U.S. at 42.  Clearly, this statement by the Court is a gratuitous hypothetical, describing one possible scenario in which the Kentucky legislature could have mandated the use of the Ten Commandments in the classroom.  But this hypothetical simply does not establish a rule that all efforts to post the Ten Commandments on public property must integrate them into a curriculum of study.  If that were the case, the Court would have to condemn its own display of Moses, who, bearing the Ten Commandments, is represented among other historical figures in a frieze on the south wall of the Supreme Court courtroom:

> Placement of secular figures such as Caesar Augustus, William Blackstone, Napoleon Bonaparte, and John Marshall alongside [Moses, Confucius, and Mohammed], however, signals respect not for great proselytizers but for great lawgivers.  It would be absurd to exclude such a fitting message from a courtroom, as it would be to exclude religious paintings by Italian Renaissance masters from a public museum.

*Allegheny*, 492 U.S. at 652-53 (footnote omitted) (Stevens, J., concurring in part and dissenting in part).

Rather than attempting to divine a rule from *Stone*, this court should apply the actual rules from the Supreme Court's landmark decisions approving the government's use of religious symbols: *Lynch* and *Allegheny*.  It is revealing that my colleagues are unable to offer any meaningful citation to either of these cases to support their reasoning.  This is not

surprising given the fact that the Court has never even suggested that there is any validity to the rules my colleagues have crafted today:  that a government may display the Ten Commandments in a public building *only* if they are integrated into a secular curriculum, and that the display must include a narration of the *proof* of the relationship between religion and the ideas and impulses that contributed to the foundation of American law and government.

In *Lynch*, the Court approved of the use of a crèche in a Christmas display that contained other symbols of the holiday such as a Santa Claus house and reindeer, even though the display contained no signs explaining the secular purpose of the display and the defendants made no attempt to demonstrate the link between the crèche and the celebration of Christmas.  Despite the defendant's failure to integrate the crèche into "a secular curriculum, such as . . . the study of history, ethics or comparative religion," *see* maj. op. at 18, the Court held that the defendant had nonetheless achieved its purpose of "tak[ing] note of a significant historical religious event long celebrated in the Western World."  *Lynch*, 465 U.S. at 680.

Similarly in *Allegheny*, where the Court approved of a Christmas display containing a Christmas tree, a menorah, and a sign bearing the phrase "Salute to Liberty," there is not even a hint of the need to integrate the menorah into a secular curriculum.  The only other message at the menorah display was the following:  "'During this holiday season, the city of Pittsburgh salutes liberty.  Let these festive lights remind us that we are the keepers of the flame of liberty and our legacy of freedom.'"  *Allegheny*, 492 U.S. at 582 (citation omitted).  Justice Blackmun concluded that this "sign serves to confirm what the context [of the display] already reveals:  that the display of the menorah is not an endorsement of religious faith but simply a recognition of cultural diversity."  *Id.* at 619 (Blackmun, J., concurring).  Thus, the defendant was able to achieve the secular purpose of recognizing cultural diversity merely through the context of the display, and not

by integrating the menorah into a secular curriculum. Moreover, the defendant's sign confirmed that same secular purpose even though it made no mention of diversity and, therefore, required the reader to make an inferential step in order to draw the connection between "our legacy of freedom" and the "recognition of cultural diversity."

Thus, neither *Lynch*, nor *Allegheny*, nor any other decision, and certainly not *Stone*, support the majority's rule that a government that wishes to use a religious symbol in a public display *must* integrate that symbol into a secular curriculum. As if the absence of authority were not enough, common sense militates against such a rule. Government monuments and displays appear in a context in which the displays must speak for themselves, for they do not present an opportunity to attach lengthy disclaimers and statements of purpose. However, in order to integrate the Ten Commandments into a secular curriculum in a manner that would satisfy the majority's new rule, the defendants would have to append to their displays a library of learned treatises and court briefs, or perhaps audio or video accompaniment, explaining beyond all reasonable doubt and in great detail what most Americans already know and the courts have expressly recognized: that "the Ten Commandments no doubt has played a role in the secular development of our society." *Books*, 235 F.3d at 302. Significantly, the majority has dismissed out of hand the signs accompanying the displays, which, among other things, explain that "[t]he Ten Commandments have profoundly influenced the formation of Western legal thought and the formation of our country." This statement succinctly describes the secular purposes for the displays and, under *Lynch* and *Allegheny*, is more than sufficient.

In its review of the context of the defendants' displays, the majority objects that the displays are "blatantly religious" because they contain an "active symbol of religion" "'concern[ing] the religious duties of believers.'" Maj. op. at 30 (quoting *Stone*, 449 U.S. at 42). This, again, is a novel statement of the law that finds no support in the Supreme

Court's landmark decisions of *Lynch* and *Allegheny*. In *Lynch*, the Court approved the display of the crèche despite the fact that the crèche has "special meaning to those whose faith includes the celebration of religious Masses." *Lynch*, 465 U.S. at 685. In *Allegheny*, the Court approved of the display containing the menorah even though it also concerned certain religious duties of the Jewish faith:

> [T]he Talmud prescribes that it is a *mitzvah* (*i.e., a religious deed or commandment*) . . . for Jews to place a lamp with eight lights just outside the entrance to their homes or in a front window during the eight days of Chanukah.

*Allegheny*, 492 U.S. at 583 (emphasis added) (footnote omitted). In both cases, the Court held that these religious icons, which necessarily concerned the religious duties of believers, were *also* symbols of a holiday that had both secular and religious meaning. *See Lynch*, 465 U.S. at 680; *Allegheny*, 492 U.S. at 613-14. Therefore, simply because the Ten Commandments may prescribe religious duties for Jews and Christians, that fact alone does not detract from its place as a symbol of the religious origins of our law and government.

Finally, there is no evidence that would undermine the defendants' fifth articulated purpose: to create a limited public forum on the walls of the Harlan County school buildings for the purpose of posting historical documents that played a significant role in the development, origins, or foundations of American and Kentucky law. "The establishment of a public forum is a laudable goal, and part of a worthy tradition dating back to the Greek agora and the Roman forum." *Americans United for Separation of Church & State v. City of Grand Rapids*, 980 F.2d 1538, 1543 (6th Cir. 1992). There is simply no indication in the record that the defendants have manipulated the forum in any way or have excluded other speakers from using the forum in a manner that would cause us to believe that this purpose is a

sham.  *See Capitol Square Review & Advisory Bd. v. Pinette*, 515 U.S. 753, 766 (1995) (plurality opinion).

The majority raises an objection to the "evolution" of the displays.  In doing so, it adopts the reasoning of the district court, which held that the history of the defendants' earlier attempts to erect constitutionally invalid displays conclusively "imprinted the defendants' purpose, from the beginning, with an unconstitutional taint[.]"  *McCreary II*, 145 F. Supp. 2d at 850.  This theory of indelible, unconstitutional "taint" not only offends common sense, it is also contrary to the law of this circuit.

We have explicitly rejected the idea that the government's past unconstitutional conduct forever taints its actions in the future.  In *Granzeier v. Middleton*, 173 F.3d 568 (6th Cir. 1999), we considered whether closing government offices on Good Friday was done for a religious purpose, violating the Establishment Clause.  The county's claimed secular purpose was that Good Friday had become part of an extended spring weekend in which many people took a short vacation and very little business was conducted.  As evidence that this explanation was a sham, the plaintiffs produced a government sign the defendant had previously posted that depicted a crucifix and stated that the offices were being closed in observance of Good Friday.  We rejected the plaintiffs' contention that the defendant's earlier religious purpose forever tainted the secular purpose it proffered at trial.  "[T]he fact that a particular closing was once constitutionally suspect does not prevent it from being reinstated in a constitutional form."  *Id.* at 574.

We noted our agreement with Judge Posner of the Seventh Circuit who reasoned in a case factually similar to *Granzeier*, that "Illinois can accomplish much the same thing either by officially adopting a 'spring weekend' rationale for the law, in place of the governor's proclamation of a state *religious* holiday, or by moving to a system of local option for school

districts."  *Metzl v. Leininger*, 57 F.3d 618, 623-24 (7th Cir. 1995).

If a unit of government's past unconstitutional conduct forever taints its actions in the future, we would not have advised the defendants in *Adland*, 307 F.3d 471, that they could cure the constitutional defects in their Ten Commandments display by changing its composition.

While we cannot pass on the merits of plaintiffs' proposals [to amend the display], we are nevertheless confident that with careful planning and deliberation, and perhaps consultation with the plaintiffs, *the Commonwealth can permissibly display the [Ten Commandments] monument in question*.

*Id.* at 490 (emphasis added).

Our sister circuits have likewise rejected the idea that a prior unconstitutional display forever taints a subsequent display as religious.  In *ACLU v. Schundler*, 168 F.3d 92 (3d Cir. 1999), the Third Circuit approved a city's Christmas display that had been modified in response to an Establishment Clause challenge:

The mere fact that Jersey City's first display was held to violate the Establishment Clause is plainly insufficient to show that the second display lacked a secular legislative purpose, or that it was intend[ed] to convey a message of endorsement or disapproval of religion.

*Id.* at 105 (internal quotation marks and citations omitted).  In fact, in *Books*, 235 F.3d 292, the Seventh Circuit actually imposed on the defendant an affirmative duty to modify an unconstitutional display:

[T]he district court must ensure that, although the condition that offends the Constitution is eliminated, [the city] retains the authority to make decisions regarding the

placement of the monument. *In making those decisions, [the city] has the right and, indeed, the obligation to take into consideration the religious sensibilities of its people and to accommodate that aspect of its citizens' lives in any way that does not offend the strictures of the Establishment Clause.*

*Id.* at 307 (emphasis added).

The U.S. Supreme Court's holding in *Santa Fe Independent School District v. Doe*, 530 U.S. 290 (2000), did not overrule these cases; nor does it require us to find that the defendants' displays are unconstitutional merely due to some past constitutional violation. In *Santa Fe*, the plaintiffs challenged a school district practice that permitted students to deliver invocations and benedictions at graduation ceremonies and football games through the elected office of student council chaplain. In response, the defendants modified their policy in order to permit students, "with the advice and counsel of the senior class principal" to decide by vote whether to have an invocation at graduation. *Id.* at 296 (internal quotation marks and citation omitted). Later, the District drafted another policy entitled "Prayer at Football Games" that permitted students to decide whether to have an invocation at football games. *Id.* at 297. The final iteration of the policy, the "October policy," permitted students to vote whether they wanted to have a student-led "invocation and/or message" at football games, and, if so, who should give the invocation or message. *Id.* at 298 & n.6. It was the October policy that was at issue in *Santa Fe*.

Significantly, the Court announced its holding by stating that "the text of the October policy *alone* reveals that it has an unconstitutional purpose." *Id.* at 314 (emphasis added). Thus, while the Court discussed the evolution of the District's prayer policy, *see id.* at 315, it expressly limited its holding to "[t]he narrow question . . . [of] whether implementation of the October policy insulates the continuation of such prayers from constitutional scrutiny." *Id.* At most, *Santa Fe* held that

a modified policy, or display, cannot be used as a shield to prevent litigation. However, *Santa Fe* does not state that a history of unconstitutional displays can be used as a sword to strike down an otherwise constitutional display.

Based on the record before us, there is abundant evidence to conclude that the defendants' declared purposes for erecting these displays were primarily secular, a complete lack of evidence that their purpose was primarily religious, and, therefore, no evidence whatever that the defendants' declared purposes constitute a hoax or fraud upon this court. I conclude that the defendants' displays do not violate the first prong of the *Lemon* test.

**B.**

The second element of the *Lemon* test, as modified in *Lynch*, is whether a reasonable observer would believe that the challenged government action constitutes an "endorsement" of religion. *Lynch*, 465 U.S. at 691-94 (O'Connor, J., concurring). Incidentally, the opinions of my brother, Judge Clay, on this issue, are his own and do not represent those of the majority of the panel.

The first thing that must be said about the *Lemon* endorsement test, is that it asks whether a "reasonable observer"—not a proselytizing religious zealot committed to the establishment of a state religion, or, on the other hand, an indefatigable professional litigant dedicated, in the name of civil liberty, to expunging God, religion, and all reference to religion from the public square—would understand these displays as having a primarily religious purpose and the principal or primary effect of endorsing religion.

As it did with respect to the secular purpose issue, Justice O'Connor's concurrence in *Lynch* "provides a sound analytical framework for evaluating governmental use of religious symbols" to decide the endorsement issue. *Allegheny*, 492 U.S. at 595. *Lynch*, the reader will recall,

upheld a Christmas display that included a crèche, a Santa Claus house, reindeer, clowns, an elephant, a teddy bear, colored lights, and a sign bearing the phrase "Seasons Greetings." *Lynch*, 465 U.S. at 671. Justice O'Connor concluded that although the crèche was an *inherently religious symbol*, a reasonable observer would not view the overall display as an endorsement of religion:

> Although the religious and indeed sectarian significance of the crèche, as the District Court found, is not neutralized by the setting, the overall holiday setting changes what viewers may fairly understand to be the purpose of the display—as a typical museum setting, though not neutralizing the religious content of a religious painting, negates any message of endorsement of that content.

*Id.* at 692 (O'Connor, J., concurring).

Justice O'Connor cited "legislative prayers . . . , government declaration of Thanksgiving as a public holiday, printing of 'In God We Trust' on coins, and opening court sessions with 'God save the United States and this honorable court,'" as examples of "government acknowledgments of religion" rather than endorsements of it. *Id.* at 693 (internal citations omitted). She stated: "[The] history and ubiquity [of] those practices are not understood as conveying government approval of particular religious beliefs." *Id.* They

> serve, in the only ways reasonably possible in our culture, the legitimate secular purposes of solemnizing public occasions, expressing confidence in the future, and encouraging the recognition of what is worthy of appreciation in society.

*Id.*

The Supreme Court returned to the issue of government use of religious symbols and the endorsement issue in *Allegheny*, when it considered the legality of two separate holiday displays. The Court held that the first display, a crèche that stood alone in a prominent location inside the county courthouse, violated the Establishment Clause because "nothing in the context of the display detracts from the crèche's religious message." *Allegheny*, 492 U.S. at 598. The Court found it significant that, unlike the crèche in *Lynch*, the Allegheny County crèche was not accompanied by other secular symbols of Christmas. However, the Court approved the second challenged display—a Christmas tree, a menorah, and a sign entitled "Salute to Liberty"—which was located at the city-county building. Justice Blackmun concluded that the second display, in which a religious symbol, the menorah, stood alongside two secular symbols, the Christmas tree and the sign, would not be perceived by the reasonable observer as an endorsement of religion: "[F]or purposes of the Establishment Clause, the city's *overall* display must be understood as conveying the city's secular recognition of different traditions for celebrating the winter-holiday season." *Id.* at 620 (Blackmun, J., concurring) (emphasis added).

Applying the analysis from *Lynch* and *Allegheny*, this court in *Adland* found that a reasonable observer would perceive a six-foot granite monument of the Ten Commandments as an endorsement of religion and that nothing in the overall display, which included a clock and several small plaques, reduced or diluted this message of endorsement. The court said it came to that conclusion largely because the monument "physically dominate[d]" the display and "'dwarf[ed]' all the other memorials . . . in the vicinity." *Adland*, 307 F.3d at 487 (internal quotation marks and citation omitted). But we explicitly left the door open for the possibility that some other display that included the Ten Commandments, in addition to secular articles, might pass the *Lemon* endorsement test if the overall display conveyed "an easily discernible, unified theme to a reasonable observer." *Id.* at 488.

Without a unifying theme to hold the display together, a reasonable observer could only view the monuments separately. If a reasonable observer views the monuments separately, unconnected by a common context, his or her attention is naturally drawn to the Ten Commandments monument, the largest monument in the display, and its accompanying religious message.

*Id.*

But that is not this case. Here, the exhibition of ten documents, one religious and the rest secular, all of identical size, none having a position of prominence greater than another, and the whole labeled as contributing to "the foundation of American Law and Government," possesses a "unifying theme" that "hold[s] the display together" and conveys a single secular message that is spelled out in each display. No reasonable observer would ignore the nine secular documents in the display, including the one explicitly declaring the secular purpose for the display, and focus exclusively on the single religious document in order to conclude that the display is an endorsement of religion.

Just like the menorah, the Christmas tree, and the "Salute to Liberty" sign in *Allegheny*, and the crèche, the reindeer, the Santa Claus house, and related secular paraphernalia in *Lynch*, and in each display in this case, it is the documents *in their totality* that comprise the defendants' displays. Therefore, it is the documents in their totality, their unifying theme, that must be assessed to determine whether a reasonable observer would see them as having the "principal or primary effect" of endorsing religion.

My colleague rejects as "transparent" the defendants' "attempt to 'secularize' the displays by surrounding the Ten Commandments with other patriotic documents and symbols." Maj. op. at 39. Thus, contrary to the directives of the Supreme Court on this issue, my colleague refuses to evaluate the displays in their totality, including the statement

of educational purpose that is part of each display, but instead focuses exclusively on the single framed copy of the Ten Commandments and the history of the defendants' repeated efforts to assemble a display that would satisfy even federal judges.

My colleague makes much of the fact that the Ten Commandments have a "'religious nature.'" Maj. op. at 38 (quoting *McCreary II*, 145 F. Supp. 2d at 851). This indisputable characterization of the Ten Commandments, however, has nothing to do with the issue of our endorsement inquiry, which asks "'what viewers may fairly understand to be the purpose of the *display*.'" *Allegheny*, 492 U.S. at 595 (emphasis added) (quoting *Lynch*, 465 U.S. at 692 (O'Connor, J., concurring)). In both *Lynch* and *Allegheny*, the Supreme Court approved of displays that contained inherently religious, even sectarian, symbols: the crèche and the menorah. The crucial fact of both of those cases was not that the symbols were religious, but that they were accompanied by secular symbols that, taken together, conveyed no message of endorsement. *See Lynch*, 465 U.S. at 679-81; *Allegheny*, 492 U.S. at 613-14. By focusing on the religious aspect of only one part of the defendants' displays, my colleague conducts precisely the same analysis that the Supreme Court rejected in *Lynch*:

The District Court plainly erred by focusing almost exclusively on the crèche. When viewed in the proper context of the Christmas Holiday season, it is apparent that, on this record, there is insufficient evidence to establish that the inclusion of the crèche is a purposeful or surreptitious effort to express some kind of subtle governmental advocacy of a particular religious message. In a pluralistic society a variety of motives and purposes are implicated.

*Lynch*, 465 U.S. at 680. My colleague's error may be summed up as follows: "Focus exclusively on the religious

component of any activity would inevitably lead to its invalidation under the Establishment Clause." *Id.*

In concluding that a reasonable observer would understand these displays, in their totality, as conveying a message of endorsement of religion, because of the religious "taint" imparted by the Ten Commandments, my colleague attributes to reasonable observers an utter lack of common sense, a profound ignorance of American history, and, arguably, an outright hostility to religion in our nation's public life. In my judgment, no reasonable observer, gazing at these displays in McCreary, Pulaski, and Harlan counties could fail to appreciate what, apparently, my colleague does not: that from the founding of the republic, religion was and always has been, an inherent component of the law and culture of our pluralistic society, and that saying so in the public square *acknowledges* religion, but does not *endorse* it.

The Supreme Court itself has declared that "religion has been closely identified with our history and government." *Abington Sch. Dist. v. Schempp*, 374 U.S. 203, 212 (1963). It is uncontested that depictions of the Ten Commandments and Moses appear in secular context in, among other places, the United States House chamber, the entrance to the national archives, and in three separate locations in the United States Supreme Court, as well as numerous courtrooms and legal settings across the country.

The history and ubiquity of the Ten Commandments in public buildings throughout the country and the universal practice of courts and legislatures publicly invoking God's blessing and guidance each day, before beginning the public's business, confirm the obvious: The inclusion of the Ten Commandments in these displays did nothing more than acknowledge the indisputable historical role of religion, and especially the canons of the Decalogue, as one of many principles, ideas, values, and impulses that, taken together, influenced the founders of this republic in shaping our law and government. Indeed, to have omitted the Ten

Commandments from the collage of documents the defendants labeled "part of the foundations of American Law and Government," would have been historically inaccurate. No reasonable observer would consider the defendants' displays to have the "principal or primary effect" of endorsing religion.

## V.

My colleagues' reasoning and conclusions are faithful neither to the language and meaning of the Establishment Clause nor to the Supreme Court's interpretation of it. What the Supreme Court said about the Christmas display in *Lynch* is perfectly applicable to the historical document displays in this case:

The Court has acknowledged that the fears and political problems that gave rise to the Religion Clauses in the 18th century are of far less concern today. We are unable to perceive the Archbishop of Canterbury, the Bishop of Rome, or other powerful religious leaders behind every public acknowledgment of the religious heritage long officially recognized by the three constitutional branches of government. *Any notion that these symbols pose a real danger of establishment of a state church is far-fetched indeed.*

*Lynch*, 465 U.S. at 686 (internal quotation marks and citations omitted) (emphasis added).

The district court erred in the legal analysis it applied and clearly erred in its findings of fact in holding that these displays violate the Establishment Clause. Therefore, it also erred in its conclusion that the plaintiffs have a likelihood of success on the merits of their claim, and perforce, abused its discretion in issuing its preliminary injunction.

I would reverse the district court's judgment and set aside the preliminary injunction.